HOFHEIMER GARTLIR & GROSS, LLP
*Counsel for the Appellee Debtor and Debtor in Possession*
530 Fifth Avenue
New York, NY 10036
(212) 818-9000
Scott R. Kipnis (SK-9147)
Douglas Gross (DG-5984)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
In re

1633 BROADWAY MARS RESTAURANT CORP.        Case No.: 08-CV-04543 (TPG)

                    Debtor.
--------------------------------------------------------------X

## DEBTOR'S LIMITED OJBECTION TO LANDLORD'S MOTION
## TO DISMISS DOCKETED APPEAL WITHOUT PREJUDICE

        1633 Broadway Mars Restaurant Corp., ("Debtor"), by its undersigned attorneys,

Hofheimer Gartlir & Gross, LLP, hereby respectfully submits its limited objection (the

"Objection") to the motion of Paramount Group, Inc. as agent for PGREF I, 1633 Broadway

Tower L.P. ("Landlord") for a dismissal of the docketed appeal without prejudice (the

"Motion"). Debtor accepts Landlord's efforts to voluntarily dismiss the Appeal (as defined

below) at this time, but files this limited objection to the proposed terms. The dismissal of the

Appeal from the Order (as defined below) necessarily means that the Order has res judicata

effect. Landlord's attempt to have the Appeal dismissed without prejudice appears to be an

attempt to undermine the res judicata effect of the Order. Consequently, Debtor opposes the

Motion to the extent Landlord seeks the dismissal to be without prejudice. Debtor respectfully

represents as follows:

## BACKGROUND

        1.      On December 28, 2007 (the "Petition Date"), the Debtor filed a voluntary petition

in the United States Bankruptcy Court for the Southern District of New York for relief under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor is engaged in the business of operating a family theme style restaurant based on the planet Mars in the year 2112.

2.    On January 24, 2008, Landlord filed a cross-motion for relief from the automatic stay to take any and all action necessary to regain possession of the premises.  By order dated February 7, 2008, the Bankruptcy Court for the Southern District of New York (Honorable Allan L. Gropper) denied, <u>inter alia</u>, Landlord's cross-motion for relief from the automatic stay (the "Order").  <u>See</u> Exhibit <u>A</u>.  Landlord filed a Notice of Appeal of the Order on February 15, 2008 (the "Appeal").  <u>See</u> Exhibit <u>B</u>.

3.    On a number of occasions, including at the March 12, 2008 hearing in the Bankruptcy Court (the "March Hearing"), Landlord's counsel stated unequivocally when questioned by the Bankruptcy Court that it did not intend to pursue the Appeal.  <u>See</u> Exhibit <u>C</u> March Hearing Tr. at 27, L. 22-25 to Tr. at 28, L. 1-8,[1] and <u>Exhibit D</u>  <u>In re 1633 Broadway Mars Restaurant Corp.</u>, --- B.R. ---, 2008 WL 2156344, *5 (Bankr. S.D.N.Y. May 22, 2008) ("The Landlord filed a notice of appeal from the order effectuating the Court's oral ruling that the Debtor had time to cure, but it did not pursue the appeal.").

4.    Until Landlord filed the Motion, Landlord took no action with respect to the Appeal and made no effort to comply with the time requirements set forth in the Federal Rules of Bankruptcy Procedure governing appeals aside from filing a notice of appeal.  <u>See</u> Fed. R. Bankr. P. 8001 <u>et seq</u>.  They failed to timely perfect the Appeal and thus dismissal of the Appeal is warranted.

---

[1]    Court: "Mr. Salomon, do you know?  Or I can ask your co-counsel.  From your two days in the case, is your client going to go forward to perfect the appeal or do you know the answer to that today?"
    Mr. Salomon: "My understanding is the client will not go forward to perfect the appeal."

5. Debtor accepts Landlord's efforts to voluntarily dismiss the Appeal at this time, but files this limited objection to the proposed terms.

## ARGUMENT

6. Bankruptcy Rule 8001(a) provides that "[a]n appellant's failure to take any step other than timely filing a notice of appeal does not affect the validity of the appeal, but is ground for such action as the district court or the bankruptcy appellate panel deems appropriate, which may include dismissal of the appeal." Fed. R. Bankr. P. 8001(a).

7. Bankruptcy Rule 8001(c)(2) states:

> If an appeal has been docketed and the parties to the appeal sign and file with the clerk of the district court or the clerk of the bankruptcy appellate panel an agreement that the appeal be dismissed and pay any court costs or fees that may be due, the clerk of the district court or the clerk of the bankruptcy appellate panel shall enter an order dismissing the appeal. An appeal may also be dismissed on motion of the appellate on terms and conditions fixed by the district court or bankruptcy appellate panel.

Fed. R. Bankr. P. 8001(c)(2).

8. Both Bankruptcy Rule 8001(a) and 8001(c)(2) provide on their face that the District Court enjoys discretion to dismiss a case on appropriate terms. The equities here require dismissal with prejudice. The Order from which Landlord failed to perfect its appeal from was a final order. An order is final if "nothing in the order … indicates any anticipation that the decision will be reconsidered." In re Adelphia Communications Corp., 333 B.R. 649, 656 (S.D.N.Y. 2005), quoting, United States Trustee v. Bloom (In re Palm Coast, Matanza Shores Ltd.), 101 F.3d 253, 256 (2d Cir. 1996). "A bankruptcy court's order is 'final' if it completely resolve[s] all of the issues pertaining to a discrete claim, including issue as to the proper relief.'" Id. (citations omitted). Courts have held that a bankruptcy court order that denies relief from the automatic stay is a final order. Adelphia, 333 B.R. at 656; In re Megan-Racine Associates, Inc.,

102 F.3d 671, (2d Cir. 1996), citing In re Sonnax Industries, Inc., 907 F.2d 1280, 1284-85 (2d

Cir. 1990); In re Taddeo, 685 F.2d 24, 26 n.4 (2d Cir. 1982).

9.     Landlord recognized that the Order was final by filing a notice of appeal without

filing a motion for leave to appeal which is required for appeals of interlocutory orders.  See Fed.

R. Bank. P. 8001(b); French Bourekas,Inc. v. Turner, 199 B.R. 807, 816 (E.D.N.Y. 1996) (by

filing a notice of appeal but failing to file a motion for leave to appeal, appellant recognized that

the Bankruptcy Court order appealed from was a final order).  Landlord chose not to perfect and

pursue its appeal from the Order in accordance with the requirements set forth in the Bankruptcy

Rules.  See Fed. R. Bankr. P. 8001 et seq.  It also obtained an extension of time from Debtor to

move for reconsideration (to the extent such an extension, even if with Debtor's consent, was

valid), but then chose not to move for reconsideration.  Despite Landlord's counsel's statements

on the record at the March Hearing, Debtor has never been presented with a written proposal to

sign and file with the clerk of the District Court that the Appeal be dismissed.

10.     Since the Order is a final order, it has res judicata effect.  The rule in the Second

Circuit for a final order of the Bankruptcy Court is that "the failure to bring an appeal of a

bankruptcy order at the earliest opportunity precludes appeal at a later stage of the bankruptcy

proceeding."  In re Telesforo, 272 B.R. 54, 57 (D. Conn. 2002), citing In re American Preferred

Prescriptions, Inc., 255 F.3d 87, 92 (2d Cir. 2001) ("[S]ome orders of bankruptcy courts, entered

in the course of Chapter 11 proceedings prior to confirmation, are final judgments, which if not

timely appealed …, are entitled to res judicata effect….  If an appeal would lie and is not

pursued, there would be a substantial argument that a party with an opportunity to appeal would

be precluded from a subsequent challenge."); Reserve Capital Corporation v. Levine, 2007 WL

329179, *3-4 (N.D.N.Y. January 30, 2007) (failure to timely appeal appointment of a trustee

barred challenging order appoint trustee or his authority).

11.     Landlord now wishes to create the right to collaterally attack the Order at a later stage of the bankruptcy case by dismissing the Appeal without prejudice.  A collateral attack on an order that was not appealed because of a party's own strategic decision has been held to be improper.  See In re Philgo Realty Co., 185 B.R. 676, 679 (Bankr. E.D.N.Y. 1995) (party that had the opportunity to appeal and that fails to perfect its appeal cannot collaterally attack the judgment).  Moreover, when a final order is not pursued, it is subject to res judicata effect.  In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2d Cir. 2001) (citations omitted). Having not perfected the Appeal, Landlord cannot now pretend that it will later be entitled to appellate review of the Order.  In the Second Circuit, the result of the failure to appeal a final appealable order is binding.  If Landlord is trying to say it is entitled to dismiss the Appeal "without prejudice" so as to be able to challenge this Order on appeal again, Debtor submits that relief is procedurally barred.

12.     Additionally, in reliance on Landlord's failure to comply with the deadlines set forth in the Bankruptcy Rules and Landlord's counsel's statement, including on the record at the March Hearing, Debtor has expended substantial sums of money and taken material steps to prosecute its bankruptcy case in the most efficient and expeditious manner possible to ensure the greatest possibility for a successful reorganization.  Debtor has complied with all deadlines set by the Bankruptcy Court and the reporting requirements set forth in the United States Trustee Operating Guidelines.  Upon the expiration of the time to perfect the Appeal, Debtor ordered a cooling tower and has expended over one hundred thousand dollars to construct said cooling tower at the premises, which is an obligation of Debtor's pursuant to the terms of its lease with Landlord.

13.     Landlord is obviously trying to now have the Order viewed as interlocutory so as to give itself a right to go back at the end of the case and have the District Court review the Bankruptcy Court's determinations.  Debtor would be tremendously prejudiced if it were to proceed to a successful conclusion of its bankruptcy case, which includes installing a cooling tower at a cost of over $1 million, only to then have Landlord re-appeal so that Landlord could again argue that Debtor is not entitled to the protections afforded it by the Bankruptcy Code. Accordingly, Landlord should be precluded from making another appeal of the Order.  See In re American Preferred Prescriptions, Inc., 255 F.3d 87, 92 (2d Cir. 2001) ("If an appeal would lie and is not pursued, there would be a substantial argument that a party with an opportunity to appeal would be precluded from a subsequent challenge.")

14.     Debtor respectfully requests that the Appeal be dismissed in accordance with the terms Landlord has proposed except that the Appeal should be dismissed with prejudice in order to bring a measure of finality to this aspect of Debtor's bankruptcy case and so Debtor will not have wasted substantial amounts of money since the time perfect lapsed.

WHEREFORE, Debtor respectfully requests that the Court grant the motion to dismiss the Appeal with prejudice and with costs borne by the respective parties.


Dated: June 10, 2008
          New York, New York

                                        Respectfully submitted,
                                        HOFHEIMER GARTLIR & GROSS, LLP
                                        *Counsel for the Appellee Debtor and Debtor-in-Possession*
                          By:
                                        /s/Scott R. Kipnis
                                        Scott R. Kipnis (SK-9147)
                                        Douglas Gross (DG-5984)
                                        530 Fifth Avenue
                                        New York, NY  10036
                                        (212) 818-9000

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                :

In re                             :

1633 BROADWAY MARS RESTAURANT CORP.   :   CHAPTER 11
                                  :

           Debtor.              :   CASE NO. 07-14062 (ALG)
-------------------------------------------------------------- x

### ORDER DENYING DEBTOR'S MOTION PURSUANT TO RULE 9006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE TO EXTEND TIME TO COMPLY WITH A PRIOR ORDER AND DENYING LANDLORD'S CROSS-MOTION TO LIFT THE AUTOMATIC STAY

Upon the motion of 1633 Broadway Mars Restaurant Corp., debtor and debtor-in possession (the "Debtor"),[1] dated December 28, 2007 (the "Debtor's Motion"), for an order pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure extending the time set forth in an order by the United States Bankruptcy Court for the Southern District of New York dated January 20, 2005 for the completion and construction of the Cooling Tower; and upon the cross-motion of Paramount Group, Inc. as agent for PGREF I, 1633 Broadway Tower L.P. (the "Landlord"), dated January 24, 2008 (the "Landlord's Cross-Motion") for an order lifting the automatic stay to permit the Landlord to take any and all action necessary to obtain possession of the leasehold premises known as 1633 Broadway (the "Premises"); and notice of the Debtor's Motion and the Landlord's Cross-Motion having been given to the Office of the United States Trustee, the Debtor's counsel, the Landlord's counsel, and the Debtor's creditors; and it appearing that no other notice need be given; and a hearing having been held before me on the Debtor's Motion and the Landlord's Cross-Motion on January 30, 2008, at which the Debtor appeared, by its counsel, Hofheimer Gartlir & Gross, LLP, and proposed special real estate

---

[1] Defined terms shall be afforded the meaning ascribed in the Debtor's Motion and the Landlord's Cross-Motion.

counsel Herrick, Feinstein LLP, in support of the Debtor's Motion and in opposition to the

Landlord's Cross-Motion, and the Landlord having appeared, by its counsel, Kramer Levin

Naftalis & Frankel, LLP, in support of the Landlord's Cross-Motion and in opposition to the

Debtor's Motion; and the Court having read and considered the papers submitted by the Debtor

and the Landlord in support of, in opposition to, and in reply to the Debtor's Motion and the

Landlord's Cross-Motion; and having heard and considered the respective arguments of counsel

on the Debtor's Motion and the Landlord's Cross-Motion, and upon the entire record hereof; and

good and sufficient cause appearing to me therefor; **for the reasons stated on the record of the**

**hearing,** it is hereby

ORDERED, that the Debtor's Motion is denied; and it is further

ORDERED, that the Landlord's Cross-Motion is denied; and it is further

ORDERED, that the Debtor shall meet and confer as soon as is practical with the

Landlord with regard to the procedures to be followed in the adversary proceeding entitled <u>1633</u>

<u>Broadway Mars Restaurant Corp. v. Paramount Group, Inc.</u>, Adv. Pro. No. 08-1045-alg, and

thereafter, the parties shall communicate with this Court to schedule an initial pre-trial

conference.

Dated: New York, New York
      February 7, 2008

                                       <i>/s/ Allan L. Gropper</i>
                                       HON. ALLAN L. GROPPER
                                       UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

ROSENBERG & ESTIS, PC
733 Third Avenue
New York, New York 10017
Tel: (212) 867-6000
Howard W. Kingsley, Esq.

*Attorneys for Paramount Group, Inc., as agent*
*for PGREF I, 1633 Broadway Tower, L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
                                 :

In re                              :   CHAPTER 11
                                 :

1633 BROADWAY MARS RESTAURANT CORP.  :  CASE NO. 07-140662 (ALG)
                                 :

          Debtor.             :
-------------------------------------------------------------------- x

## NOTICE OF APPEAL

    Paramount Group, Inc., as agent for PGREF I, 1633 Broadway Tower L.P. appeals from

the bankruptcy judge's Order denying, *inter alia*, Paramount's Lift-Stay Motion (Docket Entry

No. 57) entered in this proceeding on February 7, 2008.

    The names of all parties to the order appealed from and the names, addresses, and

telephone numbers of their respective attorneys are as follows:

APPELLANT:

Paramount Group, Inc., as agent for PGREF I,
1633 Broadway Tower L.P.

Represented by:

ROSENBERG & ESTIS, PC
733 Third Avenue
New York, New York 10017
Telephone: (212) 867-6000

RE\45400\0043\358064v1

APPELLEE:

1633 Broadway Mars Restaurant Corp.

Represented by:

Hofheimer Gantlin & Gross, LLP
530 Fifth Avenue
New York, New York 10036
Telephone: (212) 818-9000

and

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400


Dated: New York, New York
      February 15, 2008

Respectfully submitted,

ROSENBERG & ESTIS, P.C.
*Counsel for Paramount Group, Inc., as agent*
*for PGREF I, 1633 Broadway Tower L.P.*

By: _____
    Howard W. Kingsley (HK-7055)
733 Third Avenue
New York, New York 10017
Tel: (212) 867-6000

2

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

1

2  In re                          Docket No. 07-14062

3       1633 BROADWAY MARS        New York, New York
        RESTAURANT CORP.          January 30, 2008

4                  Debtor.

5

6       TRANSCRIPT OF CHAPTER 11 RE INITIAL CASE CONFERENCE
          PRETRIAL CONFERENCE (08-01045, 07-14062)
7          BEFORE THE HONORABLE ALLAN L. GROPPER
              UNITED STATES BANKRUPTCY JUDGE

8
   A P P E A R A N C E S :
9

10 For the Debtor:          DOUGLAS GROSS, ESQ.
                            SCOTT R. KIPNIS, ESQ.
                            NICHOLAS BRUCE MALITO, ESQ.
11                          Hofheimer Gartlir & Gross, LLP
                            530 Fifth Avenue
12                          New York, New York 10036-5101
                            (212) 944-0500; (212) 897-4999 fax
13

14 For Paramount Group:     CHESTER R. SALOMON, ESQ.
                            Stevens & Lee
15                          485 Madison Avenue, 20th Floor
                            New York, New York 10022
16                          (212) 537-0404; (212) 319-8505 fax

17 For Paramount Group:     WARREN A. ESTIS, ESQ.
                            HOWARD W. KINGSLEY, ESQ.
18                          Rosenberg & Estis, P.C.
                            733 Third Avenue
19                          New York, New York 10017
                            (212) 867-6000; (212) 551-8484
20

21 For U.S. Trustee:        SUSAN D. GOLDEN, ESQ.
                            Office of U.S. Trustee
22                          33 Whitehall Street, 21st Fl
                            New York, New York 10004
23                          (212) 510-0500

24 Transcriber:             AAA Electronic Sound Reporters
                            (888) 886-5135; (800) 860-5722 fax
25
   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

No witnesses

| EXHIBITS | DESCRIPTION | MARKED | RECEIVED |
|----------|-------------|--------|----------|

No documents

In re: 1633 Broadway Mars Restaurant - 3/12/08          3

1          THE COURT:  All right, I think we're up to the eleven

2     o'clock calendar.  16 -- is anything else on the ten o'clock

3     calendar?  Then, 1633 Broadway Mars Corp.  May I have

4     appearances, please?

5          MR. KINGSLEY:  Good morning, Your Honor; Howard

6     Kingsley from Rosenberg & Estis -- co-counsel from Rosenberg &

7     Estis, attorneys for Paramount Group, Landlord.

8          MR. SALOMON:  Good morning, Your Honor, Chester

9     Salomon, co-counsel for the landlord, Stevens & Lee.

10         MR. KINGSLEY:  Your Honor, also with me is Warren

11    Estis from Rosenberg & Estis.

12         MR. KIPNIS:  Scott Kipnis, Douglas Gross and Nick

13    Malito from Hofheimer, Gartlir & Gross, Debtor's counsel.  In

14    the courtroom with me is John Dunne and Mary Handlin from the

15    Debtor.

16         THE COURT:  All right.

17         MS. GOLDEN:  Susan Golden from the Office of the

18    United States Trustee.

19         THE COURT:  Any other counsel from the multiple

20    parties that we have?  Both sides now have two counsels.  Is

21    anybody going for three?

22         MR. KIPNIS:  Your Honor, we've actually paired that

23    down.  The Debtor has decided to 95 percent move forward with

24    just Debtor's primary counsel and Herrick, Feinstein's on the

25    sideline right now.

In re: 1633 Broadway Mars Restaurant - 3/12/08      4

1     THE COURT:  All right.

2     MR. KIPNIS:  To address Your Honor's concern.

3     THE COURT:  No, no concern.  Certainly, the landlord -

4  - well, no that's not true.  The landlord's going to try to

5  impose its legal fees on the Debtor.  So, we'll see whether or

6  not -- how many counsels are needed in this case.  But that's

7  for another day.  All right, where are we?

8     MR. KIPNIS:  Your Honor, when we last appeared before

9  Your Honor, Your Honor issued an advisory opinion I guess which

10  was put into a transcript in the form of the order --

11     THE COURT:  I issued an opinion.  I don't issue

12  advisory opinions.  The constitution --

13     MR. KIPNIS:  It doesn't present you to.

14     THE COURT:  -- I think applies to me.  And says I

15  can't issue advisory opinions.

16     MR. KIPNIS:  Your Honor's opinion was incorporated in

17  the order --

18     THE COURT:  But there was some advice in that opinion,

19  though I don't know that the Debtor is paying any attention

20  whatsoever to it, but that seems to be consistent with the prior

21  bankruptcy case and this one.  So, you tell me where we are.

22     MR. KIPNIS:  Well, Your Honor, to address that; Your

23  Honor issued your order on February 7.  On February 13, I

24  personally with Mr. Malito contacted the Debtor's -- the

25  landlord's counsel, and was advised at that point, which was the

In re: 1633 Broadway Mars Restaurant - 3/12/08          5

1   Thursday or Wednesday before President's week, that Mr. O'Neill

2   and Kramer Levin were going to be outgoing counsel, Mr. Kingsley

3   was going to become incoming counsel to try to hold a 26B

4   Conference.

5          Mr. Kingsley was not available.  That following week,

6   which was President's week when children had off, I made the

7   unmistakable thought of taking my children away on vacation and

8   was not available to have that conference.  And that is an

9   unusual circumstance for me, but I promised my children.  I

10  think Your Honor could understand that.

11         The next day I was back in the office was the 25th.  On

12  the 26th we contacted Mr. Kingsley and tried to hold the initial

13  case conference on the 26th.  We didn't get extremely far.  The

14  Debtor did serve its initial disclosures as required.  I believe

15  the next day on the 27th, the Debtor signed -- on the 27th, the

16  Debtor signed its actual construction contact partially with one

17  of the contractors and ordered the cooling tower.

18         I should inform Your Honor, in between this time the

19  landlord asked for an extension of time to make a motion to

20  reconsider which whether or not the Debtor had the power to

21  grant that time, the Debtor signed a stipulation which was I

22  guess the quid quo pro of the "give me an extra week to hold our

23  discovery conference because I'm going away on vacation" issue.

24         They also filed a notice of appeal.  And my

25  understanding, although I don't presume to be an expert, and I

In re: 1633 Broadway Mars Restaurant - 3/12/08          6

1  heard Your Honor say that unless there's something out there

2  that I don't know about, one a notice of appeal is field whether

3  it's in district court or bankruptcy court, it divest that court

4  of jurisdiction to hear any reconsideration of any decision.

5          We do have case law on that, Your Honor.  I have it

6  with me if Your Honor would like me to --

7          THE COURT:  That's fine.  You don't have to hand up

8  case law.  If they -- if it becomes an issue, it becomes an

9  issue.  As far as I know, I haven't received a motion for

10  reconsideration, and I haven't therefore, therefore the issue

11  before me.

12          MR. KIPNIS:  Okay.

13          THE COURT:  If a notice of appeal has been filed,

14  there is certain amount of time to take that appeal and

15  certainly Mr. Salomon knows that.  I'm not going to assume that

16  Rosenberg & Estis hasn't been around bankruptcy court enough to

17  know what too, much to their dismay.

18          MR. KIPNIS:  Well, that was the conversation I had

19  with Mr. Kingsley.  He was a little I guess shocked when I said

20  you have ten days after you file a notice of appeal to "perfect

21  your appeal."  It wasn't done and --

22          THE COURT:  I'm sure he's very grateful for the advice

23  he gets from you and that's why he hired Mr. Salomon.

24          MR. KIPNIS:  Yes.  And on that reliance, the Debtor

25  signed its construction contract with

In re: 1633 Broadway Mars Restaurant - 3/12/08          7

1          THE COURT:  Well, you've got a limited amount of time.

2     And in fact you are the Debtor and if my opinion was advisory in

3     any way, it did provide a little advice based upon my reading of

4     the statute that I believe is applicable here.  And Congress in

5     their wisdom gave us a statute that is quite indecipherable -- I

6     will not -- it's not -- indecipherable isn't the right word.  I

7     think --

8          MR. KIPNIS:  Confusing a little.

9          THE COURT:  It's not that easy to pars and there's no

10    authority under it that I know of, and the parties can if they

11    wish argue it -- not today.  If they wish, they can argue it.

12    But it's good for the Debtor and it's bad for the Debtor.  And

13    if you're -- you either go forward or you or you don't very

14    quickly.  And to the extent you want an advisory opinion that's

15    where I think we are.  And if you have a problem with discovery,

16    you want to trial -- I'll give you -- no, I can't give you a

17    trial tomorrow, but I'll certainly give you a trial on Friday.

18         MR. KIPNIS:  Well, that's why I'm here, Your Honor.  I

19    wanted to express to Your Honor where we were and the fact that

20    the time, in the Debtor's opinion, for the landlord to appeal

21    your decision has expired.

22         THE COURT:  That's a question between the appellant

23    and the appeals court.

24         MR. KIPNIS:  That's correct.

25         THE COURT:  And you have your remedies.

In re: 1633 Broadway Mars Restaurant - 3/12/08          8

1     MR. KIPNIS:  And I can't take that procedure up, Your

2   Honor, because they haven't docketed their perfection so I can't

3   get to a district court.  So, the Debtor made a decision, Your

4   Honor, to commence building the tower.

5         THE COURT:  All right.

6         MR. KIPNIS:  In connection with that, the Debtor has -

7   - Ms. Handlin has in her hands a stack of plans.  The Debtor

8   signed an actual general contracting contract to construct,

9   which calls fro substantial completion by May 31.

10         THE COURT:  All right.

11         MR. KIPNIS:  The Debtor plans on moving by next week,

12   and we've reserved with Your Honor's chambers or courtroom

13   deputy, April 9 for a hearing to move to extend the time to

14   object to at least an additional 90 days, which we believe we

15   can show cause for, which is that we need the extra time to

16   construct.  We've also reserved that date for a number of other

17   things, which is minor; attorney's fee compensation and --

18         THE COURT:  Oh, that's minor, right?

19         MR. KIPNIS:  Well, I know how Your Honor, feels about

20   that, but that's not the prime thing.  And to extend the

21   exclusivity period.  The Debtor is current with it's U.S.

22   Trustee obligations.  The Debtor has been in consultation with

23   the Office of the United States Trustee because the Debtor

24   doesn't have a committee and we view the United States Trustee

25   as our "Committee" at this point.

In re: 1633 Broadway Mars Restaurant - 3/12/08        9

1          I had taken the liberty of discussing the day-to-day
2     operations with the office of the United States Trustee and
3     where this case is going, and frankly, it's the landlord who
4     hasn't fulfilled -- if Your Honor uses the term that I used
5     improperly -- its advisory role in pursuing its remedies.  And
6     at this point, we don't feel there's a need to have an advisory
7     proceeding tried on frustration because the frustration issue,
8     Your Honor, was a alternative ground, as I recall in your
9     decision if you -- I think, Your Honor, said if you
10    misinterpreted 365 because there's no case law on the issue, the
11    frustration issue may be relevant under state law for the reason
12    why the Debtor didn't construct by December 31.
13         Sitting here today, I don't think we need to get
14    there.  I don't think the Debtor needs to spend half of its
15    legal fees that the Debtor's counsel is incurring in pursuing
16    that litigation.  The Debtor has an affirmative claim for
17    monetary relief which the Debtor could pursue after the
18    bankruptcy is concluded, or could decide not to pursue it based
19    on a cost benefit analysis.
20         Really the Debtor's business right now is to get
21    patrons into its restaurant and to build the tower.  And as
22    everyday goes on now, I'm pending more and more time assisting
23    the Debtor in getting his tower built.
24         THE COURT:  So, what you're telling me is that you'd
25    like me to adjourn everything today 'til April 9?  I think that

In re: 1633 Broadway Mars Restaurant - 3/12/08        10

1   would be probably a reasonable date, and then we'll see what

2   we'll do with your motions on that date.

3          MR. KIPNIS:  I think that would be proper, Your Honor.

4   I would like to reserve a time to come back and just reply to

5   Mr. Kingsley.

6          THE COURT:  You don't have to reserve time; you'll

7   have a chance to reply.

8          MR. KIPNIS:  But the answer and counterclaim that was

9   filed by the landlord -- and excuse me directness -- was a

10  rehashing of Your Honor's decision in my opinion.  And I may be

11  wrong and I may be a peon in this courtroom, but to me in

12  layman's terms, it was a complete rehashing of your decision.

13  It was a re-argument.  It's not the proper basis.  It was a bad

14  faith filing.  Those were issues that should have been decided

15  by motion and in fact they did file a motion --

16         THE COURT:  If the Debtor wishes to go to the expense

17  and time of moving to dismiss any of the counterclaims or moving

18  for judgment on the pleadings with respect to any of the

19  counterclaims if you've already replied thereto, then the Debtor

20  has its remedies.  If, on the other hand, you feel that they are

21  just there for window dressing or to protect the parties'

22  position, which is certainly the case for many counterclaims in

23  affirmative defenses, then that's up to you.

24         As I recall there were two potential other disputes;

25  there was the frustration dispute which, as you say, might or

In re: 1633 Broadway Mars Restaurant - 3/12/08        11

1    might not become or be moot.  And there is -- you won't let us

2    do the hip-hop parties dispute, let's call that the use of the

3    premises.

4            MR. KIPNIS:  And that's pending before the state court

5    on the Yellowstone.

6            THE COURT:  That's in the state court.  And is that

7    going forward?

8            MR. KIPNIS:  No, that's state, Your Honor, pursuant to

9    the automatic stay and --

10           THE COURT:  All right.  Well, nobody's --

11           MR. KIPNIS:  properly stayed.

12           THE COURT:  Nobody's asked me to do anything about

13   that, so be it.

14           MR. KIPNIS:  And I think that that's proper at this

15   point, Your Honor, because as you said, Congress gave us certain

16   rights and the goal of a debtor in bankruptcy is to

17   rehabilitate.  And whether right or wrong, the Debtor was wrong

18   in filing its bankruptcy three days or four days before as Your

19   Honor, indicated last time.  We took advantage of our rights.

20           THE COURT:  I didn't indicate that you were right or

21   wrong.

22           MR. KIPNIS:  We took advantage of our rights.  And to

23   allow anything else to go forward that's in violation of the

24   automatic stay, such as tort claims, which I've got a couple in,

25   or anything detracts my attention, detracts my client's

In re: 1633 Broadway Mars Restaurant - 3/12/08        12

1    attention from doing what it needs to do, which is (A)
2    rehabilitate itself, (B) more importantly construct this cooling
3    tower, which it's going to take a substantial amount of effort
4    on behalf of counsel and on behalf of the Debtor's principals to
5    get this done in time.  And as I said, I will --
6          THE COURT:  That's the Debtor's call.  If anybody
7    wants to go forward with that issue in state court obviously
8    they have their remedies.  And obviously it would look like the
9    Debtor has decided that it's going to go ahead and build the
10   tower no matter whether it wins or loses the use issue in state
11   court eventually.
12         MR. KIPNIS:  That's correct.  And I guess what I'm --
13         THE COURT:  We could simplify this case, so much the
14   better.  If we could get this Debtor out of bankruptcy sooner
15   rather than later, and let the state court resolve all matters,
16   I'm sure that the parties would probably benefit.
17         MR. KIPNIS:  Your Honor, I plan on --
18         THE COURT:  I have no doubt -- most landlords like to
19   get out of bankruptcy court.  Most people like to get out of
20   bankruptcy court.  Let me hear from them so they can get out
21   earlier today rather than later.
22         MR. KIPNIS:  My one other point -- I'll sit down in a
23   seat, Your Honor -- but the request really here was to stay the
24   adversary in its entirety.  The discovery at this point is held
25   back because of the fact that it's not necessarily needed.  And

In re: 1633 Broadway Mars Restaurant - 3/12/08        13

1   so when either party is not wasting its resources, and if Your

2   Honor determines or the issue becomes relevant again, then at

3   that point we would need to proceed and not waste the Debtor's

4   assets.  And I believe the Office of the U.S. Trustee would

5   agree with me on that issue that proceeding would waste the

6   Debtor's limited assets and funds at this point to proceed on a

7   case that may never need to go to trial.  That's what I'm here

8   today to ask Your Honor for.

9          THE COURT:  All right, let me hear from the -- what is

10  the U.S. Trustee going to add?

11         MS. GOLDEN:  Well, you know, I wouldn't necessarily

12  characterize it like that, but we are concerned with the

13  distribution of assets and the funds of the estate, and would

14  like everybody to be aware that we are paying attention to the

15  money that is being spent on all these issues.

16         THE COURT:  All right, thank you.

17         MR. SALOMON:  Good morning, Your Honor -- good

18  afternoon, Your Honor.  Chester Salomon for the landlord.

19  Judge, I read that decision the January 30.  It denied -- the

20  decision denied two motions; one made for an extension, one mad

21  for a lift stay.  There wasn't any mention in that transcript,

22  as I recall of Section 1127B and its affect on the -- the affect

23  of the prior confirmation order, which --

24         THE COURT:  Did anybody raise -- did anybody cite

25  1127B to me?

In re: 1633 Broadway Mars Restaurant - 3/12/08        14

1        MR. SALOMON:  Not that I could see in the transcript,

2   Your Honor.

3        THE COURT:  All right.  Did any of you read any of the

4   papers that the parties had submitted to me, your prior counsel?

5        MR. SALOMON:  I did again, recently, Your Honor.  I

6   cannot certify it, but I did not see from a quick glance --

7        THE COURT:  All right.

8        MR. SALOMON:  -- that there was any citation to 1127B.

9   And Your Honor --

10        THE COURT:  Well, and so -- so you're saying that I

11   should have picked that out of think air and cited 1127B of the

12   Bankruptcy Code.  And you're saying now I should give your

13   client a -- because it brought in new counsel an opportunity to

14   raise an issue that it didn't raise before.  Maybe it should,

15   maybe it shouldn't but you're certainly not going to get an

16   advisory opinion on that before me today.

17        MR. SALOMON:  Your Honor --

18        THE COURT:  If you have any rights, you know how to

19   exercise them.

20        MR. SALOMON:  Yes, Your Honor.  And we understand that

21   since the issue has not been decided by the Court, it is

22   relevant here.  And we intend to make a motion to dismiss the

23   case.  We intend to cite 1127B.  We intend to bring it on for

24   hearing on November -- sorry -- on April 9, which is the hearing

25   date, a holding date that apparently exists for various other

In re: 1633 Broadway Mars Restaurant - 3/12/08    15

1    motions, including the 365D motion to extend the time.  We think

2    that would be propitious -- a propitious time for Your Honor to

3    consider all of these issues.

4         THE COURT:  Propitious may not be the right word;

5    maybe practical.  From my perspective it's not propitious, but

6    shall we say practical?

7         MR. SALOMON:  Fine, Your Honor.

8         THE COURT:  So, you don't have to come down multiple

9    times.

10        MR. SALOMON:  I agree with that.  I enjoy coming down

11   here, Your Honor, and I don't come down --

12        THE COURT:  I know, but your colleagues probably --

13   most of your colleagues don't enjoy it as much as you.  You've

14   been down here probably more often.

15        MR. SALOMON:  Judge, the frustration issue that is

16   raised in the adversary complaint is relevant.  It is relevant

17   to the issue of --

18        THE COURT:  Do you -- do you --

19        MR. SALOMON:  Even extending the time -- excuse me,

20   Judge.  Even on their motion to extend the time for an

21   additional 90 days to assume or reject, it is relevant on that

22   issue.  And we have proceeded in preliminary discovery and we

23   want to complete the discovery as quickly as possible.  We do

24   want a trial date; not Friday, Your Honor.  Because we think

25   there will be depositions that are required.  There are

In re: 1633 Broadway Mars Restaurant - 3/12/08          16

1    additional documents that need to be produced.

2          THE COURT:  How long have you been in this case?

3          MR. SALOMON:  I filed the notice of appearance the day

4    before yesterday, Your Honor.

5          THE COURT:  All right.  So, why don't you spend a

6    little time reading some of the pleadings that you've just

7    referred to, thinking about the issues, and if you think that

8    the case should be pre-tried and there should be discovery, go

9    right ahead.  I don't have a motion to stay.  I have an oral

10   application to stay, and you can certainly respond to that, and

11   I will take this as a response.  If discovery hasn't been

12   proceeding as quickly as you believe it is appropriate under the

13   circumstances, you have your remedies; go to it.

14         MR. SALOMON:  Well, Judge, part -- this is, as I

15   understand, at a conference on the adversary proceeding --

16         THE COURT:  Yes, it is.

17         MR. SALOMON:  -- and we would hope that the Court

18   could assist us with discovery and --

19         THE COURT:  I don't have a problem yet.  Nobody tells

20   me that discovery is refused.  Have you met and conferred, which

21   is --

22         MR. SALOMON:  There has been a meet and confer, Your

23   Honor.

24         THE COURT:  There has been.  All right.  And I that

25   unsuccessful?  What needs to be done today?

In re: 1633 Broadway Mars Restaurant - 3/12/08          17

1      MR. SALOMON:  I -- well --

2      THE COURT:  Are there document demands that are

3  unanswered by the Debtor

4      MR. SALOMON:  There are some and there are --

5      THE COURT:  All right.  Well --

6      MR. SALOMON:  -- there are depositions that we have

7  requested.  We don't have a timetable.

8      THE COURT:  All right.  Why don't you -- I know in two

9  days perhaps you haven't been able to get that done.  But why

10  don't you try to put that together rather than appeal to me in

11  vague terms that we want to go faster.  If you want to go faster

12  -- I'm hearing that you're not accepting the premise of what the

13  Debtor said; that this whole issue may be moot and can be

14  stayed.  It's their issue in the first instance.  It's entirely

15  their issue; not yours as I understand it.  I would ordinarily

16  think it would be they who would want to go forward to try to

17  prove that issue.

18      You are right; it might be relevant to the motion to

19  extend time to get the additional 90 days, and on the issue of

20  cause.  If it is, you can certainly take discovery on that

21  contested matter once you respond to that motion or perhaps even

22  before.  I'm not trying to -- and it might be relevant to that

23  motion; it might not.  Their motion might simply be based on the

24  premise that we can't finish the tower within the initial 120

25  days, but Congress gave us an additional 90 days potentially

In re: 1633 Broadway Mars Restaurant - 3/12/08      18

1   upon a showing, and we are going to finish it in 90 days.

2   Frustration may have nothing to do with that.  In that case, if

3   your client wants to spend a lot of money on the frustration

4   litigation, separate and apart from the cause for an extension

5   of time issue, it's not for me to stand in the way.  If parties

6   want to stay litigation, they have their right to move for that.

7   I would only hope that those who have come into the case a

8   little bit later than I did will become thoroughly knowledgeable

9   about the case, and then they have their remedies, and I'm open

10  for business.

11       April 9 probably is as good a date as any for these

12  issues to come before me.  I'm going to deny the application to

13  stay the law suit at least to the extent of saying that the

14  Debtor has an answer -- I think it's called an answer as opposed

15  to a reply today to the counterclaim.  It should file them.

16  That's not a difficult pleading to file.  Let's at least get the

17  pleadings completed.

18       MR. SALOMON:  Judge, one request, please?

19       THE COURT:  Certainly.  You are here and I don't want

20  the parties to have to file motions unnecessarily.  I don't want

21  expenses on either side to be unnecessarily increased.  But on

22  the other hand, it's very difficult for me to deal with, "Well,

23  we're going to do this."  Or, we think -- I think the parties

24  should perhaps do a little more talking among themselves, rather

25  than to each other through me.  But go ahead.

In re: 1633 Broadway Mars Restaurant - 3/12/08        19

1         MR. SALOMON:   Thank you.

2         THE COURT:  Any issue you wish to raise?

3         MR. SALOMON:  Yes, there's one important issue.

4         THE COURT:  Any, any?  It doesn't have to be one.

5    There can be two or three or multiple issues.

6         MR. SALOMON:  This is a pre-trial conference on an

7    adversary proceeding.

8         THE COURT:  Yes.

9         MR. SALOMON: The adversary proceeding complaint was

10   dated January 28, only two days before the hearing before, Your

11   Honor on the two motions to dismiss and to lift stay -- I'm

12   sorry, to extend time, and to lift the stay.  Your Honor has

13   averted on January 30 and again today to the appropriateness of

14   setting an early trial date.  We'd like a trial date.

15        We'd like Your Honor to fix a trial date which may be

16   able to address all of these motions.  It may be the 9th.  If it

17   were the 9th, we're prepared for the 9th, Your Honor.  We can do

18   it another date too, but we want to do it soon.  We do not want

19   this excuse of having signed a contract, which is nice but that

20   contract could have been signed over a year ago.  And that

21   should not preclude a determination of the legal issues here;

22   their claim of frustration, their motion for extension of time

23   to assume or reject, and our motion to dismiss.  All of those

24   could be tried and heard and we could have an evidentiary

25   hearing if there are disputed issues of fact.  So, I'm asking

In re: 1633 Broadway Mars Restaurant - 3/12/08        20

1    that Your Honor set a date.  It may not be the 9th of April.  You

2    may have a full calendar that day, but some date around that

3    time so that we could have our hearing.  They wanted a hearing;

4    we want a hearing.  And so I would ask if you would please set a

5    trial date for us.

6            THE COURT:  All right.

7            MR. KIPNIS:  Your Honor, may I respond?

8            THE COURT:  Certainly.

9            MR. KIPNIS:  Your Honor, my firm filed the adversary

10   proceeding with the assistance of Herrick Feinstein, and again,

11   not to rehash it, it was done so as an alternative ground to --

12   as an excuse as to why the Debtor did not perform a construction

13   of a cooling tower by the 31st.  I reiterate that Mr. Salomon

14   very well knows the bankruptcy rules and the fact that they

15   haven't perfected their appeal, I believe that moots that issue.

16           And for me -- and I will take any order Your Honor

17   gives me -- to spend half of my firm's legal fees and have

18   someone fully spend time on a frustration issue, which by my

19   reading of Your Honor's opinion into the transcript only comes

20   into question if -- and if I may Your Honor just repeat it.  It

21   says, "Moreover, even if I am wrong on the extent of

22   365(b)(1)(a), the tenant would have the right under state law to

23   argue that the landlord's breach of the lease excuses it's non-

24   performance."  I don't think we need to hit there.

25           And to respond to the counterclaims before April 9, is

In re: 1633 Broadway Mars Restaurant - 3/12/08    21

1   it going to require the Debtor to file the motion to dismiss

2   their counterclaims.

3        THE COURT:  You don't have to -- you never have to

4   file a motion to dismiss.

5        MR. KIPNIS:  But I thin procedurally --

6        THE COURT:  You can simply reply to the counterclaim

7   and you save your right to move for judgment on the pleadings

8   later on.  Is there any dispute about that?

9        MR. SALOMON:  No, dispute, Your Honor.

10       MR. KIPNIS:  I think tactically --

11       THE COURT:  No dispute.

12       MR. KIPNIS:  Normally we would do a motion to dismiss.

13  Maybe Your Honor we would contemplate what Your Honor said, but

14  maybe at that point, Your Honor, we can -- and if Your Honor

15  would like me to brief it in a short-letter brief, Your Honor,

16  maybe that would be helpful as to why it should be stayed today

17  for my -- the witnesses that -- and I'm not handling that part

18  of the action.  My partner, Mr. Gross is.  But from what I saw

19  this morning, the witnesses that they want to take depositions

20  of Your Honor are the general contractor, the engineer, of my

21  client's president, of its CFO.  The people that very well need

22  to be on-site to get the water tower built.  Now, if I had GC

23  sitting for preparation of depositions and my engineers for

24  deposition, I don't see how that relates to the frustration

25  issue.  Adamantly, it's going to cause my client a problem to

In re: 1633 Broadway Mars Restaurant - 3/12/08          22

1   meet the state, which is now going to be a new frustration
2   issue.  And I don't need to be before Your Honor on that.  You
3   know I think I told Your Honor my background.  I helped build
4   300 stores a year for a retailer and making a simple roof
5   penetration and putting in a cooling tower is not a real
6   sophisticated set of construction, although it involves a lot of
7   piping, a lot of calculations and a lot of on-site supervision.
8   And I won't be able to do that, Your Honor, if I'm stuck in
9   discovery and having them pull my professionals off the job.
10  I'm not going to hit my May 31 completion date.  I don't need to
11  argue frustration, Your Honor, to ask Your Honor for an
12  extension of time.
13          THE COURT:  You have your remedies and last I looked
14  you were a lawyer, not a construction manager.
15          MR. KIPNIS:  That is true, Your Honor.
16          THE COURT:  And I think I can take judicial notice of
17  one thing.
18          MR. KIPNIS:  Yes, Your Honor.
19          THE COURT:  That this tower is not going to be built
20  if it's built by lawyers.
21          MR. KIPNIS:  That's true, Your Honor.  Although some
22  of them you never know.  But Your Honor --
23          THE COURT:  I think --
24          MR. KIPNIS:  As I said, Your Honor, we have a general
25  contractor --

In re: 1633 Broadway Mars Restaurant - 3/12/08    23

1    THE COURT:  That would be unfair to the landlord.  The

2   landlords feel that bankruptcy judges are often unfair, but to

3   have this tower built by -- that would be unfair to your client

4   too.  I think you ought to stay out of the construction end of

5   it.

6    MR. KIPNIS:  As, Your Honor, knows we have a maze of

7   permit issues to get through.  We have a maze of issues to get

8   through with getting the landlord to sign permits.  I understand

9   there's a new issue that may brew or may not brew on getting the

10  landlord to sign the permit and I don't want to malign the

11  landlord in any way, shape or form prematurely until that

12  situation --

13    THE COURT:  you'll wait to malign the landlord.

14    MR. KIPNIS:  I will wait to malign the landlord.  But

15  I will say that if my client and my client's professionals who

16  they've hired to build this are distracted in litigation, I will

17  not hit the May 31 date.  And Your Honor that May 31st date if

18  I'm not incorrect is approximately two months prior to the

19  ultimate discretion Your Honor has in giving us an extension of

20  time.  So, we built in significant leeway.

21    And I also want to point out as Your Honor noted the

22  last time, the 365, we don't need to cure all defaults at the

23  time of -- under the new code -- at the time of assumption.  And

24  we need to have adequate assurance that it will be done.  I'm

25  trying to do --

In re: 1633 Broadway Mars Restaurant - 3/12/08        24

1     THE COURT:  Read -- Mr. Salomon, what are you going to

2  say to that?

3     MR. SALOMON:  Your Honor, I don't agree with that

4  legal contention.

5     THE COURT:  Because?

6     MR. SALOMON:  Because I think that they have to cure.

7     THE COURT:  And why do they have to cure at the time

8  of assumption of or assumption of assignment of the lease, why?

9     MR. SALOMON:  Well, we're talking hypothetically.

10    THE COURT:  Ordinarily -- ordinarily, is it not true

11  under the bankruptcy code which you have some familiarity with

12  that a Debtor can assume a contract by showing adequate

13  assurance of future performance and not necessarily performing

14  immediately.  There may be a question of fact, but in theory a

15  landlord can show that.  Is that true or not?

16    MR. SALOMON:  As an ordinary proposition, that is

17  correct.

18    THE COURT:  And is it the landlord's position in this

19  case today that this Debtor has that right, assuming of course

20  that there is time.  And I know you're reserving your right,

21  that the lease expired, there was a conditional limitation

22  that's gone; but reserving that right, is there any special rule

23  that applies in this case that would disallow them the ordinary

24  right to show adequate assurance of future performance at the

25  time of assumption?

In re: 1633 Broadway Mars Restaurant - 3/12/08          25

1    MR. SALOMON:  Your Honor, I would like to defer the
2    response to that question --
3    THE COURT:  No, answer it now.  What is the landlord's
4    position?
5    MR. SALOMON:  Oh, our position is that if they're
6    going to -- if Your Honor doesn't dismiss this case; if Your
7    Honor extends the time for them to assume --
8    THE COURT:  I'm not prejudging that, but they do have
9    -- I have already come to the conclusion that they have until
10   the 120 days from the date of the petition.  I'm not going to
11   presume that I'll give them another day.  That will be heard, I
12   gather, on April 9.  Passing that issue, is there any special
13   rule that ought to apply in this case as according to the
14   landlord?
15   MR. SALOMON:  Yes, Your Honor.  I think firstly, you
16   take a look at the history of this case, 1127B says --
17   THE COURT:  1127 hasn't been raised in this courtroom
18   until you've just raised it.  If you wish to raise it, you have
19   your remedy.
20   MR. SALOMON:  Yes.
21   THE COURT:  Okay.
22   MR. SALOMON:  And on 365 I do not have the section of
23   the code before me, Your Honor.  I would --
24   THE COURT:  And you're telling me you didn't even
25   glance at it?

In re: 1633 Broadway Mars Restaurant - 3/12/08          26

1      MR. SALOMON:  I did glance at it.

2      THE COURT:  You did glance at it.  It seems to me that

3  if it applies and anybody can make any argument they wish, it

4  does limit the Debtor's time.  And I want the Debtor to

5  understand that very, very clearly.

6      MR. KIPNIS:  Your Honor, in reading Colliers, because

7  it's really an (inaudible) case law on this, I believe that --

8  and Mr. Malito pointed out to me --

9      THE COURT:  Colliers is always right.

10     THE COURT:  I know, but I believe that in the

11  commentary that the Debtor has to make its motion and get is'

12  motion heard and decided prior to the expiration of 120 days.

13  It makes a logical sense in reading it.

14     THE COURT:  We're not talking -- we're talking

15  about --

16     MR. KIPNIS:  The 90-day portion --

17     THE COURT:  -- 365(B)(1).

18     MR. KIPNIS:  The 90-day portion I believe does not

19  have to actually be decided by the end of the 90 days, nor do I

20  believe that the Debtor has to cure all defaults.  In fact I do

21  this day-in and day-out, and no landlord has ever raised that.

22  We have an adequate assurance test and Your Honor would decide

23  the actual issue.

24     THE COURT:  All right.  Maybe you should bring back

25  your co-counsel.

In re: 1633 Broadway Mars Restaurant - 3/12/08          27

1        MR. SALOMON:  I think it's --

2        THE COURT:  I think you should go and read (B)(1) and

3   read it very carefully.  And read Colliers discussion about the

4   2005 amendment to (B)(1).  And we're in a post-2005 case.  Mr.

5   Salomon apparently wants to relive the last case.  But the one

6   thing I'm quit sure of is that we're now in a post-2005

7   amendment case.

8        MR. KIPNIS:  As I said, the Debtor proposes to have

9   its tower completed by May 31, which is 60 days --

10       THE COURT:  I heard you state that.

11       MR. KIPNIS:  Which is 60 prior -- approximately 60

12  days, Your Honor, prior to the ultimate extension Your Honor can

13  give.  But I also believe that the code does say the Debtor has

14  to show adequate assurance.

15       THE COURT:  We'll get to that.  If we need to ever get

16  to that, we'll get to that.

17       MR. SALOMON:  Judge, I'm looking at (B)(1)(a) and it

18  seems to me that that section requires, in this case anyway,

19  that the cure cannot be extended.  There is no adequate

20  assurance rule.  The adequate assurance rule under (B)(1)(a)

21  seems to have been carved out by the language here.

22       THE COURT:  Well, that's the question and I raise it

23  because as you said, this is a pre-trial conference.  The issue

24  should be put on the table, and I'd like to get to the real

25  issues.  Mr. Salomon, do you know?  Or I can ask your co-

In re: 1633 Broadway Mars Restaurant - 3/12/08      28

1   counsel.  From your two days in the case, is your client going

2   to go forward to perfect the appeal or do you know the answer to

3   that today?

4            MR. SALOMON:  My understanding is the client will not

5   go forward to perfect the appeal.  This was a narrow issue on

6   lifting the stay.  We want instead to address the merits of the

7   adversary proceeding and to make the motion to dismiss the case,

8   Your Honor.

9            THE COURT:  Okay.  All right.  And the motion for

10  reconsideration is probably moot at this point in the case.

11           MR. SALOMON:  It has not been pursued, Your Honor.

12           THE COURT:  It's not been pursued.  All right.  Thank

13  you for that forthright statement.   That I think should give

14  the Debtor, if the Debtor is listening, some direction going

15  forward in terms of what you intend to do.  If you intend to --

16  I think you should answer the counterclaims.  If you want to

17  make a motion, you can do what you want, but we have answer.

18           If you want to move for a stay of that litigation, you

19  may.  If you want to voluntarily -- based upon Mr. Salomon's

20  statement that they've not going to appeal the last order, and

21  you feel that the frustration issue is now irrelevant, at least

22  insofar as the adversary proceeding is concerned, I don't think

23  you can discontinue that suit since there is an answer.  But you

24  can certainly move to discontinue it without prejudice.

25           All of the issues that Mr. Salomon is concerned about,

In re: 1633 Broadway Mars Restaurant - 3/12/08          29

1    the frustration issue, could come up on April 9 in the context

2    of that contested matter if you say that one reason you need the

3    additional 90 days is that you were somehow frustrated if that's

4    an issue.

5          You may take the position -- and I am trying to see if

6    I can simply things.  You may take the position that frustration

7    is irrelevant; you need the 90 days so that you can complete the

8    tower, period, full stop.  If that's the case, then there may be

9    a legal issue as to whether or not that justifies an extension

10   of time.  I can see the landlord's position being no, your

11   position is yes, frustration is -- at least pre-petition --

12   frustration is arguably irrelevant to that issue or if not

13   irrelevant, a side issue that parties needn't litigate to the

14   helm.

15         So, I think all I can do today -- this is a pre-trial

16   conference -- all I can do today is direct the parties to see if

17   they can simplify matter.  I think we've simplified matters

18   today somewhat with regard to the appeal and the motion for

19   reconsideration.  We are where we are with regard to the

20   adversary proceeding.

21         I think the parties -- I'm going to direct the parties

22   again to meet and confer.  You can either withdraw it or move to

23   withdraw or you can go forward.  And if Mr. Salomon wants to

24   litigate it for whatever reason, I think he has a right to.  He

25   should propose to you -- to the other side, a discovery schedule

In re: 1633 Broadway Mars Restaurant - 3/12/08          30

1    and I think you should move forward on it if that is the

2    landlord's demand while it's outstanding; while the suit is

3    pending.

4          I'm not going to set a discovery timetable today, but

5    I am going to -- I'll se where we are on April 9.

6          MR. KIPNIS:  Your Honor, can I ask a favor -- two

7    questions.  One, counsel indicated they're not going to move

8    forward with the appeal.  The way I understand the rules or the

9    way I recall the rules is the only way that that can be dealt

10   with is by stipulation of the parties which Your Honor can so-

11   order.

12         THE COURT:  Talk to them, don't talk to me; if they're

13   willing to stipulate to withdraw the appeal.  Obviously that

14   ends the interlocutory appeal.  It doesn't preclude an appeal at

15   the end of the case.

16         MR. KIPNIS:  And secondly, Your Honor, I hear you

17   about responding to the counterclaims.  Will Your Honor

18   entertain an application at that point after counterclaims are

19   responded to, to stay the case to April 9?  Because I'm telling

20   Your Honor sitting here that I don't plan on raising frustration

21   issues as a reason to seek an extension of 120 days.  And thus I

22   think it's a waste of the Debtor's assets and estate and it's a

23   detriment to its estate which is my charge as a fiduciary to

24   this estate to not waste the asset to the estate and I think

25   that that's what's in the best interest of the Debtor's estates.

In re: 1633 Broadway Mars Restaurant - 3/12/08          31

1      THE COURT:  All right.

2          MR. KIPNIS:  I think the Office of the U.S. Trustee --

3      THE COURT:  I think you should discuss that

4  immediately with Mr. Salomon and maybe you can come to some kind

5  of an agreement as to what the issues will be on April 9.

6          One reason I'm not going to set a discovery timetable

7  today is that I do think the April 19 hearing is an important

8  one and I do think I should focus on the real issues.  And if as

9  counsel has said, frustration is irrelevant and they're going to

10  be relying for cause on other factors, then perhaps the

11  adversary proceeding is simply something that should be focused

12  on after April 9, and not -- I think it should be focused on

13  beforehand.

14          I think the parties should meet and confer; certainly

15  document demands can be -- if they haven't already been --

16  should be exchanged --

17      MR. KIPNIS:  They have been exchanged, Your Honor.

18      THE COURT:  That's already the first step.  And if you

19  want to say to them -- or if you want to move to stay that

20  litigation on whatever grounds, you have your right to do so.

21      MR. KIPNIS:  Okay, Your Honor.

22      THE COURT:  You also have the right to move to

23  withdraw it.

24      MR. KIPNIS:  Would Your Honor accept a short-letter

25  brief on that issue?

In re: 1633 Broadway Mars Restaurant - 3/12/08          32

1     THE COURT:  No, you can make a motion.

2     MR. KIPNIS:  Okay.

3     THE COURT:  You know it doesn't have to be -- I'll be

4  happy to accept a short motion.  I accept a short motion from

5  all parties.

6     MR. KIPNIS:  I was trying to short-circuit the

7  timeframe.

8     MR. SALOMON:  Judge, although there may be a desire

9  not to -- and counsel has said, it will not raise -- the Debtor

10 will not raise for the frustration issue at the hearing on its

11 motion to extend time.  We are still seeking discovery --

12    THE COURT:  Sure.

13    MR. SALOMON:  -- and I want to know whether or not

14 counsel would agree to the continuation of discovery on the

15 issues that are on the table as of now?

16    MR. KIPNIS:  Your Honor, if they're seeking discovery

17 of my professions, that is the exact reason why I would move to

18 stay the adversary proceeding because those professionals are

19 needed.  As Your Honor, pointed out, not me, that those

20 professionals are need to build this tower.  And if those

21 professionals are not available to build the tower, but has to

22 be stuck in depositions and document demands which to me seems

23 completely irrelevant from the frustration issue, the general

24 contractor might --

25    THE COURT:  Have you brought your motion for an

In re: 1633 Broadway Mars Restaurant - 3/12/08          33

1    extension of time?

2          MR. KIPNIS:  We brought that motion on -- no, we've

3    drafted, Your Honor, and it will be filed by I think Monday or

4    Tuesday of next week.

5          THE COURT:  All right.  Well, when that motion is

6    filed, then the Debtor will see what it says and be able to take

7    discovery in connection with that motion.  If the Debtor wants

8    to take discovery in connection with the adversary proceeding

9    apart from the motion, then you have your remedies to object and

10   move to either dismiss the case or stay it, and the Debtor has -

11   - pardon me.  The landlord has its remedies and I'll hear those

12   issues also on April 9.

13         MR. KIPNIS:  Okay, Your Honor.

14         THE COURT:  So, you can use that date.  On the basis

15   of the record today, I see no need for an expedited treatment of

16   that adversary proceeding since the landlord has its remedies

17   and its discovery rights with regard to the real issue before,

18   the contested matter, and whether there's cause for an extension

19   of time.  None of this has anything to do with reasonable

20   discovery on that issue.  However, I would ask the parties to

21   meet and confer on that discovery issue.  I certainly have no

22   reason on the basis of today's hearing to be optimistic that

23   you'll be able to agree on almost anything, but times change.

24         Mr. Salomon has been on the case for all of two days,

25   and perhaps he can take a little bit more time to study it and

In re: 1633 Broadway Mars Restaurant - 3/12/08        34

1    perhaps we can have an agreed discovery timetable leading up to

2    April 9.  What is your 120 day?

3              MR. KIPNIS:  Approximately, Your Honor, it is April 27

4    -- 26.

5              THE COURT:  All right, so --

6              MR. KIPNIS:  We can set it forth two weeks --

7              THE COURT:  All right.

8              MR. KIPNIS:  -- approximately in advance for that

9    reason, Your Honor.

10             THE COURT:  Okay.

11             MR. KIPNIS:  Mr. Salomon and I have spoken over the

12   last couple of weeks.  I tried to get this moving and

13   unfortunately we were at an impasse which is why I wrote Your

14   Honor the letter and asked Your Honor for this conference to try

15   to see where we are because it just seemed like an extraordinary

16   expense for the Debtor to go through for what it doesn't see

17   that it needs to go through any longer.

18             THE COURT:  Well, then you have your remedies to move

19   to dismiss the case, or to move to stay it.

20             MR. SALOMON:  Your Honor, if there's going to be a

21   motion to stay this proceeding -- to stay the adversary

22   proceeding, can Your Honor at least direct that that motion be

23   filed by the end of this week or Monday?

24             THE COURT:  Is that a problem?  It doesn't have to be

25   a complicated motion.

In re: 1633 Broadway Mars Restaurant - 3/12/08        35

1       MR. KIPNIS:  I think at the time of filing, Your

2   Honor, by Tuesday, that we file the motion to extend -- seeking

3   time to extend the time and exclusivity.  We can get them all

4   out at the same time.

5       THE COURT:  Tuesday, all right.  Yes, combine them

6   all.  That would certainly be helpful.  And in the meantime, you

7   can perhaps simplify matters by considering just what the real

8   issues are at this point and what you need to litigate and what

9   you don't need to litigate?

10      MR. SALOMON:  One central issue for us, Your Honor,

11  which we don't believe has been addressed by anybody up until

12  now is the 1127B issue.  And that --

13      THE COURT:  Well, it may not have been addressed but

14  you've just said it all.  No, it hasn't been addressed.  No, one

15  has brought a -- This is a bad faith motion?  Nobody brought a

16  bad faith motion.  Whether it's timely or not obviously is not

17  an issue before me at the present time.  You have your rights.

18  Don't tell me what -- you know don't -- you're not expecting me

19  to --

20      MR. SALOMON:  I'm not expecting you to rule --

21      THE COURT:  to rule or to do anything other than to

22  tell you that you have -- whatever rights you have, you have.

23  And I do think that it's use for the parties to get at the real

24  issues in this case.  It's sometimes a little difficult when

25  counsel turns over because one counsel may think one thing is

In re: 1633 Broadway Mars Restaurant - 3/12/08          36

1    the real issue and another counsel obviously thinks another

2    thing is the real issue.  And I'll take what comes before me.

3    I'm not looking to impose expensive formality on the parties in

4    terms of pleadings and the like, but I can't deal with well

5    we're -- you know we think this is the real issue.

6            I'm happy to get a preview club that one party is

7    going to use on the other.  That seems to be inevitable when you

8    deal with landlord-tenant disputes, but so be it.  I can only

9    take what I get before me, and I've told that to the Debtor in

10   terms of the adversary proceeding.  If it's moot, maybe the

11   easiest thing to do is to get rid of it.  And if that appeal is

12   moot, then I think that might well be formalized too so that we

13   know where we stand and the real issues, as the parties see

14   them, can come before me.

15           Now, April 9 is a Wednesday.  It looks like that may

16   be a lengthy hearing.  Has that been set for what, ten o'clock,

17   eleven?

18           MR. KIPNIS:  10:00 a.m., Your Honor.

19           THE COURT:  Well, we might change that time, but I

20   guess we have a limited number of parties so we can leave it

21   there now.  But maybe --

22           MR. KIPNIS:  2:30 Your Honor would be better for you?

23           THE COURT:  -- 2:30 would be -- would make more sense

24   and I could give you the afternoon.  You don't have to wait

25   around.

In re: 1633 Broadway Mars Restaurant - 3/12/08      37

1          MR. KIPNIS:  So, we should change it to 2:30, Your
2    Honor?

3          THE COURT:  2:30?

4          MR. SALOMON:  It's okay.

5          THE COURT:  All right.

6          MR. KIPNIS:  We'll confirm a letter to your --

7          THE COURT:  2:30.

8          MR. KIPNIS:  Thank you.  All the motions carry forward
9    to --

10         THE COURT:  Then make all the motions returnable at
11   2:30.

12         MR. KIPNIS:  Thank you for your time, Your Honor.

13         THE COURT:  Now, did I set anything else for April 9
14   today?

15         MR. KIPNIS:  Yes.

16         THE COURT:  I did at 2:30?

17         MR. KIPNIS:  In the morning.

18         THE COURT:  In the morning?

19         MR. KIPNIS:  The morning.

20         THE COURT:  In the morning, all right.  Thank you very
21   much.

22         MT. KIPNIS:  Thank you, Your Honor.

23    (Whereupon, the matter was adjourned 'til April 9 at 2:30 p.m.)

24

25

1                                    CERTIFICATION

2

3           I, Rochelle Grant, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter.

6

7   Dated:  March 13, 2008.

8

9

10

11                                 _____

12                                 Signature of Approved Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

Westlaw.

--- B.R. ----
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

In re 1633 Broadway Mars Restaurant Corp.
Bkrtcy.S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States Bankruptcy Court,S.D. New York.
In re 1633 BROADWAY MARS RESTAURANT
CORP., Debtor.
1633 Broadway Mars Restaurant Corp., Plaintiff,
v.
Paramount Group, Inc., as agent for PGREF I, 1633
Broadway Tower, L.P., Defendant.
**Bankruptcy No. 07-14062 (ALG).**
**Adversary No. 08-01045(ALG).**

May 22, 2008.

Hofheimer Gartlir & Gross, LLP, by Scott R. Kipnis,
Esq.Douglas Gross, Esq.Nicholas B. Malito, Esq.,
New York, NY, Attorneys for Debtor.
Stevens & Lee, P.C. by Chester B. Salomon, Esq.,
Constantine D. Pourakis, Esq., New York, NY,
Attorneys for Paramount Group, Inc.
Rosenberg & Estis, P.C. by Howard W. Kingsley,
Esq., Hal N. Beerman, Esq., New York, NY,
Attorneys for Paramount Group, Inc.

**MEMORANDUM OF OPINION AND ORDER
ON PARAMOUNT GROUP, INC.'S MOTION
TO DISMISS**

ALLAN L. GROPPER, United States Bankruptcy
Judge.
*1 Before the Court is a motion to dismiss the
Chapter 11 petition of 1633 Broadway Mars
Restaurant Corp. (the "Debtor"), brought by
Paramount Group, Inc., the Debtor's landlord (the
"Landlord"). The Landlord has moved to dismiss the
case on the ground that it is a bad faith attempt to
modify an earlier plan of reorganization that has been
substantially consummated. The Court held an
evidentiary hearing over the course of five days.[FN1]

> FN1. The evidentiary hearing also subsumed
> the Debtor's motions for an extension of the
> period in which it may assume or reject its
> nonresidential real property lease (the
> "Lease") under § 365(d)(4)(B) and for an
> extension of the period in which it has the

exclusive right to file a plan of
reorganization and solicit acceptances
thereof under § 1121(d)(1) of the
Bankruptcy Code. As the hearing
progressed, it became clear that the Debtor's
motions would need to be dealt with prior to
a decision on the motion to dismiss because
of looming deadlines under the Code. The
Court granted the Debtor's motions for
extensions of time by order dated April 23,
2008.

*BACKGROUND*

*The Debtor*

The Debtor is a corporation wholly-owned by Mars
Acquisition Corp. ("MAC"), a holding company that
in turn is owned by a group of investors in Ireland. In
1998, the Debtor and Landlord entered into a
nonresidential Lease for space at 1633 Broadway,
between 50th and 51st Streets, in New York City.
The Debtor rents approximately 33,000 square feet of
space accessed from a plaza opening to the street and
operates a theme restaurant called Mars 2112,
catering principally to children and their
families.[FN2] The Landlord's building is a "Class A"
50-story office tower with "blue chip" tenants and is
also the home of the Gershwin Theatre, currently the
largest legitimate theatre on Broadway.

> FN2. As discussed below, the Debtor also
> rents out the restaurant for late-night parties
> that are decidedly not oriented toward
> children and their parents.

The Lease, dated as of January 30, 1998, is a
comprehensive 109-page document providing for,
among many other things, payment of rent, use of the
premises, and improvements. Importantly, for
purposes of this motion, the Lease as originally
drafted required the Debtor to construct, within two
years of commencement of operations, a cooling
tower to provide condenser water for a separate air
conditioning system. The cooling tower would enable
the restaurant to obtain its own air conditioning and
to detach itself from the building's system, which in

turn would free up capacity so that the Landlord could provide additional condenser water to other tenants.[FN3] The Debtor did not construct a cooling tower within the first two years of its operations; the record does not show whether the Landlord informally waived the requirement or whether there was a Lease amendment.

> FN3. Roger Newman, Senior Vice President of Property Management for Paramount Group, testified that other tenants have asked for additional cooling, and the Landlord has had to turn them down. With the Debtor removed from the building's general service, the Landlord would be able to sell more supplemental air conditioning to other tenants at $1000 and $1200 per ton of water. Newman testified that capacity to meet a tenant's additional cooling needs improves goodwill and is a factor in tenants' decisions to renew leases and potential tenants' decisions to rent space in the building. A cooling tower would also permit the Debtor to obtain its air conditioning independently, as other tenants have done; the record does not show whether the cost, amortized over the Lease, would be more or less than the Debtor is currently paying.

*The Debtor's First Chapter 11 Case*

In any event, the Debtor fell on hard times and on March 27, 2002 filed its first Chapter 11 case. There is no issue that the Debtor was in financial distress when it filed in 2002. According to its papers in that case, "The immediate need for commencement of the case is insufficient working capital. Mars 2112's underlying financial difficulties arise out of inadequate customer and sales volume ... especially in light of the tragic events of September 11, 2001."(Rule 1007-2 Affidavit of Joseph C. Dolan, Case No. 02-11406, ECF# 1, Exh. B.)

Two developments in the prior case are of importance to the instant motion. First, during the course of the case, the Landlord filed an adversary proceeding seeking to prevent the Debtor from continuing to conduct late-night parties at the restaurant. The Landlord relied on a use-clause in the Lease providing that the Debtor would use the premises "solely for the operation and maintenance

of a high quality public sit-down table service tablecloth restaurant ..." and claimed that the parties damaged its ability to maintain the Class A character of the building. The Landlord's motion for an injunction was resolved by a stipulation, dated November 6, 2002, providing that after December 31, 2002 the Debtor "shall not host any Events or other functions substantially similar to the Events, regardless of the type of music or theme, at the Premises without the express written consent of the Landlord in its sole and absolute discretion ..." The term "Events" was defined as "certain hip-hop/rap special functions, including, without limitation the 'Planet Rock' functions and other events sponsored by the Power 105.1 radio station ... [that] have taken place at the Premises."

*2 The second development in the prior bankruptcy case was a settlement of all issues between the Landlord and the Debtor that the Debtor has conceded, in this case, represented economic concessions that it needed to confirm its Plan. The agreements with the Landlord were incorporated in a Stipulation, dated January 20, 2005, that was an exhibit to and approved and so-ordered by the Court in the Confirmation Order. The Stipulation reduced the Debtor's rent, changed certain other terms of the Lease and, again critically for purposes of this case, extended the Debtor's time to construct the cooling tower by an additional three years. The clause with respect to the cooling tower purported to create a conditional limitation in the Lease that would result in automatic termination of the Lease if the tower were not installed by December 31, 2007. It reads as follows:

> 7. The Debtor shall be required to install an evaporative cooler as contemplated in section 17.06 of the Lease so that installation is completed by December 31, 2007. Starting no later than January 1, 2007, the Debtor shall provide weekly written reports to the Landlord as to the status of such installation (the "Progress Reports"). Failure to complete such installation by December 31, 2007 (the "Installation Deadline") shall be deemed to constitute a breach of a conditional limitation resulting in the immediate termination of the Lease. (Landlord's Exh. 6A.)

The provisions in the Stipulation relating to the Lease were thereafter incorporated in the Lease as

--- B.R. ----                                                                    Page 3
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

amendments. According to the Final Decree in the Debtor's first case, the Debtor's Plan was substantially consummated on or before August 29, 2005.

It appears that relations between the Debtor and the Landlord remained unexceptional for the rest of 2005 and 2006, or the record does not indicate otherwise. It also appears that the Debtor continued to lease out its space for late-night parties, providing the Landlord with notice and a list of the parties and receiving no apparent complaints. On the night of February 3-4, 2007, however, an incident took place at approximately 3:40 a.m. that resulted in a fight and a victim with lacerations on both sides of his head. The Landlord, quoting the police report, places the fight in the Debtor's "club"; the Debtor claims the fight took place outside on the street. In any event, the Landlord sent the Debtor a demand that it cease operating "a nightclub in the Premises" and when the Debtor only canceled the parties for a few days, sent the Debtor a notice of default, dated March 1, 2007, formally advising the Debtor that there were violations of the Lease's use provisions and purporting to terminate the Lease. The Debtor responded, asserted that it was not in violation of the Lease and filed an action in State court, obtaining a "*Yellowstone* " injunction that tolled the time to cure the default pending judicial determination of the dispute.[FN4]The State proceeding was not resolved until July 27, 2007, when the State court ruled that the Landlord's notice had been improperly vague and inadequate, in response to which the Landlord sent a new notice, dated August 23, 2007, and the Debtor obtained a second *Yellowstone* injunction. The second State case was scheduled for trial on April 9, 2008, but was eventually stayed by the instant bankruptcy filing; neither party has taken any action to pursue the case since the bankruptcy petition was filed.

> FN4. A *Yellowstone* injunction, named after the case *First Nat'l Stores v. Yellowstone Shopping Ctr.,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968), is a remedy which "maintains the status quo so that a commercial tenant, when confronted by a threat of termination of its lease, may protect its investment in the leasehold by obtaining a stay tolling the cure period so that upon an adverse determination on the

merits the tenant may cure the default and avoid a forfeiture."*Graubard Mullen Horowitz Pomeranz & Shapiro v. 600 3rd Ave. Assoc's,* 93 N.Y.2d 508, 514, 693 N.Y.S.2d 91, 94, 715 N.E.2d 117, 120 (1999). In *Yellowstone,* the New York Court of Appeals held that even though a landlord-tenant dispute over obligations under a lease was resolved in favor of the tenant, because the tenant had not requested a temporary restraining order in connection with its declaratory judgment action, the State court was unable to revive a lease that terminated before the dispute was resolved. "While seemingly unremarkable, the *Yellowstone* case ushered in a new era of commercial landlord-tenant law in New York State. As a result of this decision, tenants developed the practice of obtaining a stay of the cure period before it expired to preserve the lease until the merits of the dispute could be resolved in court."*Graubard Mullen,* 93 N.Y.2d at 514, 693 N.Y.S.2d at 94, 715 N.E.2d at 120.

**\*3** The foregoing dispute may have disrupted the amicable landlord-tenant relationship. For whatever reason, subsequent to the March notice of default, the Landlord served the Debtor with a series of notices with respect to alleged defaults under the Lease. One, sent on April 3, 2007, was based on the Debtor's failure to pay rent on a timely basis and provide reports on its progress in constructing the cooling tower.[FN5]Although the Debtor claimed that it had typically and in the ordinary course of business paid rent within 30 to 45 days of invoice, it paid the amounts and cured. It also began providing reports on the cooling tower. On May 7, 2007, the Landlord sent a notice of default for failure to provide a verified statement of gross sales, and the Debtor again cured. On May 23, 2007, the Landlord demanded the Debtor increase its liability insurance coverage from $5 million to $100 million. The Debtor demanded arbitration of this issue in accordance with the provisions of the Lease, but the parties ultimately settled, and the Debtor increased its coverage to $15 million.

> FN5. It will be recalled that the Stipulation quoted above, later incorporated in the Lease, required the Debtor not only to install

the cooling tower by December 31, 2007 but also to provide the Landlord with reports throughout 2007 on its progress.

Although, as mentioned above, the Debtor commenced sending reports to the Landlord on installation of the cooling tower in response to the Landlord's notice of default, the early reports showed *no* progress whatsoever. In April 2007, Daniel Breslin, the Landlord's property manager, and Mary Hanlon, the Debtor's CEO and President, began emailing one another about the status of the cooling tower's construction. In May 2007, Hanlon informed Breslin that the Debtor had retained Cosentini Brothers as consultants on the project, and it later retained Plaza Construction as general contractor on the project.[FN6] Notwithstanding the retention of a general contractor, however, virtually no progress was made until the very end of 2007, shortly before this case was filed. After December 5, 2007, the Landlord and Debtor, usually through Hanlon and Breslin, exchanged a flurry of emails scheduling walkthroughs, canceling and rescheduling walkthroughs, requesting more information from one another (mostly drawings of existing infrastructure), and explaining that information was already sent, irrelevant to the project, or unavailable because tenants on the relevant floors had redesigned those floors. In all, the Court received into evidence fifty-seven such emails submitted by the Landlord and twenty-seven such emails submitted by the Debtor.[FN7]

FN6. The Lease gave the Landlord rights of approval of the Debtor's contractors, and it ultimately approved Plaza, even though Plaza is not on the Landlord's pre-approved list for general contractors for major projects on the Building. After filing this case, the Debtor apparently fired Plaza and hired another company as general contractor, on the ground the latter concern would do the work for $400,000 less than Plaza. The Landlord, however, refused to approve the substitute concern on the premise that the substitute did not have enough experience in "Class A" commercial buildings on a project that, if improperly executed, could cause major damage to the building and its other tenants. The Court was asked to determine whether the Landlord was within its rights

under the Lease to reject the substitute as general contractor for this project. On April 15, 2008, the Court ruled that the project entailed base-building work as defined in § 5.01(e)(i) of the Lease and that the Landlord could reject the substitute in its complete discretion. The Court also found that even if this project were not base-building work, the Landlord's rejection was reasonable under the circumstances in view of the nature of the project. The Debtor thereafter retained Plaza once again.

FN7. After this case was brought, information disputes continued. On March 20, 2008, the Landlord moved by order to show cause for a preliminary injunction that would in effect excuse the Landlord's agents from responding to any of the Debtor's requests for information or walkthroughs on the ground that the Debtor's requests were burdensome and that any progress made on installing the Cooling Tower might prejudice the outcome of its motion to dismiss. The Landlord offered to extend the Debtor's time to assume or reject during a standstill period but the parties could not come to any agreement. The Court held a hearing on March 26, 2008, following which it denied the motion from the bench, holding that the Landlord had not shown irreparable injury.

The parties dispute the degree of cooperation that the Debtor received from the Landlord with respect to installation of the tower. The Debtor admits that Breslin was cooperative and responded to the Debtor's inquiries. (Hr'g Tr., Apr. 29, 2008, p. 533.) Its main complaint is that the Landlord's notices of default issued in 2007 created a climate of uncertainty and contention regarding the Lease that made it impossible for the Debtor to obtain outside financing for the cooling tower project or to convince its shareholders in Ireland to finance the project.[FN8] The Landlord also refused the requests of the Debtor's principals for a meeting and refused to respond to a settlement proposal that the principals conveyed on November 19, 2007. Although the Debtor made some efforts to move forward on construction toward the end of 2007, it cannot be disputed that it started much too late to complete the

project by the Lease deadline of December 31. Installation of a cooling tower entails significant construction work over an extended period at a cost of more than $1 million, and no work could have been performed toward the end of December on actual installation of the tower because of a City moratorium on work in the Times Square area prior to the celebration of New Year's Eve.[FN9] In short, the Debtor simply ran out of time.

> FN8. The Court heard testimony from Timothy Brosnan, the largest investor, who had invested $3 million in MAC to fund the Debtor following the first bankruptcy. Brosnan testified that the Landlord's notices throughout 2007 caused him concern about financing the tower.

> FN9. For this project, a two-ton cooling tower would have to be hoisted up to the roof of the Gershwin Theatre by a specialized crane service and secured to the roof in a location able to support its weight without damage to the theatre's operations. The City of New York would have to issue multiple permits. Connecting the cooling tower to the restaurant would also involve gaining access to the building's electrical infrastructure, constructing new pipes, and taking the restaurant off the building's existing systems. The project cost is currently estimated by the Debtor at $1.4 million, although Hanlon hopes it will ultimately cost $1.2 million (Hr'g Tr. Apr. 29, 2008, p. 607). There is no dispute that it will take weeks (if not months) to obtain all the permits and to complete the project.

*The Debtor's Second Chapter 11 Filing*

**\*4** On December 27, 2007, three days before the Lease deadline for construction of the cooling tower, the Debtor filed the instant bankruptcy case. Concurrently with the petition the Debtor filed a motion in which it sought to vacate that part of the Stipulation in the prior case that required it to install a cooling tower by December 31, 2007, and it filed an adversary proceeding against the Landlord seeking a declaration that the Landlord's actions in 2007 had frustrated the Debtor's ability to perform under the Lease. At the time of the petition, according to the

Debtor's amended schedules, it had $2,650,201.49 in prepetition unsecured claims, $1 million of which was owed to the Landlord, another $1 million owed to Brosnan, its principal shareholder, and $235,000 owed to Hanlon. Three secured creditors are listed with secured claims for equipment leases or prepaid dining charges, totaling $178,920. There are fifty-eight other creditors with general unsecured claims totaling approximately $415,200.

The Landlord responded to the Debtor's filing with a motion for relief from the automatic stay (or a determination that the automatic stay was not in effect). The Landlord did not ask the Court to dismiss this case as a bad faith filing. It argued that the conditional limitation, incorporated in the Lease, requiring tower installation by the end of 2007, resulted in the automatic termination of the Lease on December 31, 2007, as the tower had not been installed by that time. The Landlord also denied that the Court in the instant case had any jurisdiction to amend a stipulation entered in a closed, earlier case. The Debtor opposed the Landlord's motion for stay relief, arguing among other things that the Bankruptcy Code gave it time to assume or reject the Lease and prevented the Landlord from relying on a post-petition default.

On January 30, 2008, the Court denied both the Landlord's and the Debtor's motions from the bench. (Hr'g Tr., Jan. 30, 2008, p. 50.) The Court denied the Debtor's motion for an order amending the Stipulation in the 2002 case on the ground that it had no power to amend an order in a prior, closed case. The Court denied the Landlord's motion for relief from the stay on the ground that § 365 of the Bankruptcy Code gives a debtor a limited amount of time to assume or reject a nonresidential real property lease, where the conditional limitation in the lease has not yet been triggered, and even if the default were otherwise what is known as an "incurable historical default".[FN10] The Court noted that there had been a split of authority as to the effect of "incurable historical defaults" in prior cases under § 365 of the Bankruptcy Code, but that § 365(b)(1)(A) of the Code, as amended in 2005, gave a debtor time to cure an historic or non-monetary default that might, under non-bankruptcy law, be considered incapable of cure. *See* 3 *Collier on Bankruptcy* ¶ 365.05 (15th ed. rev.2007).[FN11] Because the statute allows a debtor to cure an historical default, the Court also held it did

--- B.R. ----
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

not have to decide whether the Lease, as amended by the Stipulation, required the Landlord to give the Debtor notice of the default in order to trigger the conditional limitation.[FN12]

> FN10. The Landlord argued that the Debtor could not cure the default since December 31, 2007 had passed and the deadline to install the cooling tower had been missed.

> FN11. The prototype historical default is a provision in some leases requiring the lessee to remain open continuously or to meet certain sales targets. Lessors argued that a debtor that had "gone dark" for a period or that had missed the targets could not cure the default. Before the 2005 amendments to the Bankruptcy Code there was a split in authority as to a debtor's ability to cure such a default. Compare *Worthington v. General Motors Corp. (In re Claremont Acquisition Corp.), 113 F.3d 1029, 1034-35 (9th Cir.1997)* (no right to cure nonmonetary defaults), with *Eagle Ins. Co. v. BankVest Capital Corp., 360 F.3d 291, 300-301 (1st Cir.2003)* (inconsistent with policies underlying Code not to allow cure of non-monetary default).

> FN12. It found that the Stipulation, standing alone, could be read to create an automatic termination of the Lease if the tower were not installed by December 31, 2007, but that the clause, which was incorporated in the Lease, could also be read to require the Landlord to serve a notice of default and a demand to cure. See §§ 12.01(e) and (f) of the Lease. There is no dispute that after the Chapter 11 filing, the Landlord was barred from sending a notice of default by the automatic stay.

**\*5** The Landlord filed a notice of appeal from the order effectuating the Court's oral ruling that the Debtor had time to cure, but it did not pursue the appeal. Instead, on February 13, 2008, it substituted counsel and, four weeks later, filed the instant motion to dismiss. The Debtor concurrently filed motions to extend time to assume or reject the nonresidential Lease and to extend the time in which the Debtor can exclusively file a plan of reorganization. As noted

above, the Landlord's motion for a preliminary injunction, which would have enjoined any contact between the parties' agents or employees in connection with the cooling tower and would have had the effect of stopping any progress on the cooling tower's installation, was denied. The motion to dismiss was then the subject of a hearing on April 9, 10, 11, 28, and 29. As also noted above, the Debtor's motions to extend time were granted without prejudice to the determination of the Landlord's motion.

*DISCUSSION*

*Bad Faith*

The Landlord has moved to dismiss this bankruptcy case on the ground that it was filed in bad faith. Although motions to dismiss for lack of good faith are usually predicated on § 1112 of the Bankruptcy Code, providing for dismissal of a Chapter 11 case for "cause," neither in § 1112 nor in any other part of the Code is there a specific requirement that a filing be in "good faith." The doctrine has been developed by judges to ensure that the extraordinary powers and rights given to Chapter 11 debtors are not abused. In the usual case, the test of bad faith in this Circuit is whether "it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings."*Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.), 931 F.2d 222, 227 (2d Cir.1991)*, quoted in *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship ), 113 F.3d 1304, 1309 (2d Cir.1997)*. The test as a whole looks to the Debtor's intentions and realistic goals. There is no question that the power to dismiss on bad faith grounds should be used "with great care and caution." *Carolin Corp. v. Miller, 886 F.2d 693, 700 (4th Cir.1989)*.

Although this case bears some of the usual indicia of a bad faith filing, there is no basis for a finding that the Debtor did not, on the filing date, have an intention to reorganize and a reasonable probability of a successful case (if it can save its Lease). Moreover, this case does not evidence most of the factors of a bad faith filing that were listed by the Court in *C-TC 9th Ave. P'ship*.[FN13]The Debtor's revenues are improving, it can meet its expenses,

including installation of the cooling tower, it employs approximately 100 people, and it has 58 general unsecured creditors (not counting insiders). If the Debtor can build the cooling tower and cure its default under the Lease, it expects to be able to pay its creditors in full and operate successfully in the future. It appears to be the Debtor's position that it can do so notwithstanding termination of the late-night parties.

> FN13. In *C-TC 9th Ave. P'ship,* the Second Circuit listed several factors as indicia of a bad faith filing. They are:
>
> (1) the debtor has only one asset;
>
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
>
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
>
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
>
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
>
> (6) the debtor has little or no cash flow;
>
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
>
> (8) the debtor has no employees.
>
> *C-TC 9th Ave. P'Ship,* 113 F.3d at 1311.

**\*6** However, this is not the usual case because there was an earlier confirmed and consummated plan of reorganization for this same debtor. There is authority that "Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings."*Elmwood Dev. Co. v. General Elec. Pension Trust (Matter of Elmwood Dev. Co.),* 964 F.2d 508, 511 (5th Cir.1992). The Landlord claims this case is a repeat filing the only purpose of which is to modify the Debtor's obligations under the first Plan, specifically the Stipulation setting a December 31, 2007 deadline for installation of the cooling tower. The Landlord argues that any modification of the 2005 Plan is barred by § 1127(b) of the Bankruptcy Code, which prohibits modification of a confirmed plan after it has been substantially consummated.[FN14]*See Elmwood,* 964 F.2d at 511;*In re Tillotson,* 266 B.R. 565, 568 (Bankr.W.D.N.Y.2001); *In re Northtown Realty Co., L.P.,* 215 B.R. 906, 911 (Bankr.E.D.N.Y.1998). In *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859 (7th Cir.1989), the Seventh Circuit sustained a second filing but said that a second reorganization case, with an eye towards curing defaults arising under a previously confirmed chapter 11 plan, is so akin to modifying the previous plan as to be impermissible. *Jartran,* 886 F.2d at 867, citing *In re Northampton Corp.,* 39 B.R. 955, 956 (Bankr.E.D.Pa.1984).[FN15]

> FN14.Section 1127(b) reads in relevant part, "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan ..."

> FN15. In *Jartran,* the debtor filed a second Chapter 11 petition within one-and-a-half years of the first. A creditor objected to the alteration of its rights under the first plan and demanded that its claim be given administrative priority in the second case because that is what was promised in the first plan. Id. at 859.Ruling against the creditor, the Seventh Circuit distinguished *Jartran* from other Chapter 11 cases that had treated serial filings as in bad faith *per se.*The Court placed particular importance on the fact that the debtor planned to liquidate in the second Chapter 11 case and did not intend to base its new plan on the avoidance of obligations arising from the first case. "Rather, the new plan is for liquidation-and the bankruptcy court

specifically found that Jartran II is not an attempt to modify the terms of the Plan, but rather is a good faith admission that Jartran was unable to continue operating as a going concern."' *Id.* at 868, citing *In re Jartran,* 71 B.R. 938, 942 (Bankr.N.D.Ill.1987).

Notwithstanding the importance of protecting the integrity of the reorganization process, there are exceptions to the rule against serial filings. Second reorganization cases that would modify earlier plans have been permitted on a showing of unanticipated changes in circumstances that were not foreseeable at the time the first plan was confirmed. *See Elmwood,* 964 F.2d at 511;*Tillotson,* 266 B.R. at 569, citing *In re Adams,* 218 B.R. 597 (Bankr.D.Kan.1998); *Northtown Realty Co.,* 215 B.R. at 911. As the Circuit Court stated in *Elmwood,*"A second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief."*Elmwood, 964 F.2d at 511-12.* The debtor must have a genuine need to reorganize, and these unforeseen changes in circumstance must contribute to the debtor's default under its obligations from the earlier bankruptcy. However, so as not to undercut § 1127(b), "courts construe the concept of material change in circumstances quite narrowly."*In re 234-6 West 22nd St. Corp .,* 214 B.R. 751, 757 (Bankr.S.D.N.Y.1997), citing *In re Roxy Real Estate Co., Inc.,* 170 B.R. 571, 576 (Bankr.E.D.Pa.1993).

Moreover, the provisions of the prior Plan which the Debtor proposes to amend must be an "integral component" of an earlier plan of reorganization, as this factor bears on the equities of whether the provision can be modified. *See In re Trans World Airlines, Inc.,* 261 B.R. 103 (Bankr.D.Del.2001); *Tillotson,* 266 B.R. at 568. In *Trans World Airlines,* TWA's third Chapter 11 case, the Bankruptcy Court held that the debtor was entitled to reject a contract under Bankruptcy Code § 365 notwithstanding that in its prior case it had committed not to reject the contract in a subsequent bankruptcy and this commitment had been made part of the confirmation order. Arguing that the debtor was judicially estopped from amending its prior plan, the creditor contended that it had relied on the debtor's waiver of rejection rights in any future case when it agreed to the provision in the earlier confirmed plan. The Court

held that the confirmation order standing alone was insufficient evidence that the earlier Court had relied on the commitment in confirming the plan. It concluded that the provision had not been an integral part of the prior plan and said that the creditor's "argument leads to the untenable conclusion that judicial approval of a contract is a representation by the parties to the court not to breach the contract in the future."*In re Trans World Airlines, Inc.,* 261 B.R. at 113 (emphasis omitted).

*The Filing of this Case*

**\*7** At the time it filed this case, the Debtor did not argue that circumstances had changed since it confirmed its first case, but it did file an adversary proceeding claiming that the Landlord had frustrated its performance under the contract by precluding it from obtaining financing for the cooling tower's construction. If a party intentionally frustrates another's performance, it cannot prevail in an action against the non-performing party premised on the missed performance. A litigant seeking relief must have "acted fairly and without fraud or deceit as to the controversy in issue."*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 342 U.S. 806, 814-15 (1945); *see also Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir.1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons ... available only to those debtors and creditors with 'clean hands.' "). If a creditor sabotages a debtor's performance under a plan of reorganization, it cannot cry foul when the debtor fails to perform. Such an outcome would indeed be unanticipated by the debtor, which is entitled to rely on the performance of creditors' obligations under a Plan.

The Debtor has effectively abandoned the adversary proceeding in which it alleged contract frustration, and wisely so. On the record before it, the Court finds that the Debtor has failed to prove that the Landlord frustrated its attempts to build the cooling tower. The Landlord admittedly sent notices of default to the Debtor, plus a demand to increase insurance coverage, but there is no evidence that the notices were sent in bad faith or that they did not have a valid basis. The parties' dispute over the Debtor's late-night parties was longstanding and if the Landlord gave the

--- B.R. ----                                                                    Page 9
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

Debtor significant forbearance in connection with the use covenant, there is no evidence that it waived its right to insist on compliance with the provision.[FN16]Newman credibly testified that the notices of default were sent because the Landlord felt it was being damaged by what it perceived as the Debtor's disregard of the use limitations in the Lease and its other defaults. A party is entitled to enforce what it believes in good faith to be its legal rights. *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 897 (Fed.Cir.1998); *Thur v. IPCO Corp.,* 173 A.D.2d 344, 569 N.Y.S.2d 713 (1st Dept.1991), *app. dismissed,*78 N.Y.2d 1007, 575 N.Y.S.2d 457 (1991).

> FN16. This Court does not make the finding that the Debtor's late-night parties violated the Lease, an issue that is the subject of pending State court litigation. Under the Lease, however, waiver cannot be implied from the Landlord's prior conduct in countenancing "events." § 18.02. The Court finds only that the Landlord had a good faith basis for demanding compliance with the use provisions and for contending that the Debtors' parties were consistent neither with the use provisions of the Lease nor the Stipulation entered into the prior case. That Stipulation did not forbid the Debtor from hosting parties only if rap or hip-hop music were played (as the Debtor seems to contend now), but it covered similar events "regardless of type of music or theme."

Moreover, the Debtor failed to demonstrate that its access to funds and financing for the tower was wholly frustrated by the Landlord's legal actions. The testimony of one of the Debtor's principal investors was that at all relevant times he had the capacity to advance funds to the Debtor to build the tower. Moreover, the investor has now placed $600,000 in escrow towards the costs of installing the tower, and he testified that he will cover the remaining costs.

**\*8** Nevertheless, even though the Debtor did not prove that the Landlord had frustrated its performance under the Lease, the question is not whether there was frustration of performance. There are two related questions that must be considered in connection with a determination as to the Debtor's good faith: First, whether there was a change of

circumstances sufficient to justify the second Chapter 11 case and afford the Debtor time to install the tower. Second, whether the Debtor's breach was a provision in the first Chapter 11 case that was so integral to the prior Plan that it should be deemed incurable through a second Chapter 11 filing. Although the question is a close one, the Court is persuaded that the good faith requirements relating to a second Chapter 11 filing should not be construed to preclude this Debtor from curing its default.

First, there was some limited change in circumstances. The Debtor's prior good relations with the Landlord had changed, and the investors had a good faith reason to be concerned. Financing was not precluded, but the Debtor did establish that the Landlord's multiple notices of default made it impractical for the Debtor to finance the cost of building the tower through any source other than its foreign investors. Standing alone this change in circumstances was not sufficient to justify the filing.[FN17]

> FN17. The Debtor has totally failed to explain its response to the actions of an increasingly hostile Landlord. Assuming that the Debtor's principals did at all times want to save the Lease and their millions of dollars in leasehold improvements, they have never explained why they gave their Landlord the ability to argue that the Lease had irrevocably terminated under applicable law.

> The Debtor also offered a downturn in general economic conditions as a change in circumstances justifying the second filing. In ¶ 15 of its Opposition to the Landlord's Motion to Dismiss, the Debtor alleges that its business has suffered because "the country appears to have slipped again into a recession at the end of 2007."Changes in general economic conditions, however, are "an insufficient basis for a second Chapter 11," because parties should anticipate market downturns when taking on new obligations under a plan of reorganization. *Northtown Realty Co.,* 215 B.R. at 913, citing *Lincoln Nat'l Life Ins. Co. v. Bouy, Hall & Howard and Assocs. (In re Bouy,*

--- B.R. ----
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

Page 10

*Hall & Howard and Assocs.*), 208 B.R. 737, 745 (Bankr.S.D.Ga.1995) and *In re Roxy Real Estate Co., Inc.,* 170 B.R. at 576.

The Debtor also made the argument that the Landlord did not want or need a cooling tower and that this whole dispute is a tactic to terminate a below-market lease. There is nothing in the record to support the contention that the Landlord does not want the Debtor to install a cooling tower. The Landlord has insisted on the construction of a cooling tower since the Lease took effect in 1998. Its senior vice-president testified as to the reasons why the Landlord bargained for the Debtor's construction of a cooling tower. Moreover, it is not even clear on this record whether the Debtor holds a below-market lease.

But it does not stand alone, as the Debtor's default does not relate to a provision that was a provision of the previous Plan. Concededly, the requirement of installation by December 31, 2007 was incorporated in a Stipulation that was approved in connection with entry of the Confirmation Order. However, the terms on which the Lease was assumed were not a Plan provision, and there is no evidence that they were to be enforceable on an ongoing basis as a Plan provision. On the contrary, provisions in the Stipulation relating to the Lease were intended to be and were in fact incorporated into the Lease, and they were intended to be enforceable as such. The Landlord argues that the December 31, 2007 deadline should be enforced not only as a Plan provision but as a conditional limitation in a lease that the tenant cannot cure. The dispute is most appropriately characterized as one involving an ongoing obligation of the reorganized entity, not an integral provision of the prior case that the Debtor cannot breach. *See In re Trans World Airlines, Inc.,* 261 B.R. at 113.

The Court recognizes that finality is an important aspect of any plan of reorganization. Any Chapter 11 case is likely to represent a long, arduous process for debtors and creditors alike, and parties should be able to rely on the finality of deals agreed to in connection therewith. The Court is sympathetic to a Landlord's desire that there be an absolute deadline, beyond which it will simply not have to deal with a tenant any longer. If finality were the only issue, the Court might find that the case should be dismissed on bad faith grounds. But finality is not the only issue, as it is rarely the only issue in landlord-tenant disputes. In addition to the fact that the December 31, 2007 deadline was not, strictly speaking, a provision "integral" to the Plan, the critical issue on this motion is that the Landlord is asking the Court to apply a judge-made doctrine in a manner that would result in the forfeiture of a lease.

**\*9** There are many cases in which courts have refused to countenance a lease forfeiture. As the Second Circuit said in *Queens Blvd. Wine & Liquor Corp. v. Blum,* 503 F.2d 202, 206 (2d Cir.1974), a case under Chapter XI of the prior Bankruptcy Act, "Courts traditionally have not favored lease forfeitures. They often have strained to construe forfeiture claims narrowly or to find them not an 'express' covenant within the requirement of the statute."[FN18] The Circuit held there that a reorganization court, determining whether to enforce a clause permitting the Landlord to terminate the lease on a bankruptcy filing, "must consider not only the interests of the landlord but also those of the debtor and its creditors."*Queens Blvd.,* 503 F.2d at 206. It found that the reorganization court had discretion to refuse to enforce a lease termination clause where forfeiture of the lease would have "totally frustrated an arrangement by depriving the debtor of an asset absolutely necessary to its continued viability," and where the landlord would not suffer any real prejudice. *Id.* at 207.

> FN18. This was a reference to § 302 of the Bankruptcy Act, now repealed, that provided that "an express covenant that ... the bankruptcy of a specified party ... shall terminate the lease or give the other party an election to terminate the same shall be enforceable."11 U.S.C. § 702 (1970) (repealed).

Since *Queens Blvd.* was issued, the Bankruptcy Code has rendered bankruptcy termination clauses unenforceable and § 365 of the Code has a series of provisions that govern nonresidential real property leases in a Chapter 11 case, balancing the interests of landlords and tenants. The rights of debtors cannot lightly be limited, as the Second Circuit re-

--- B.R. ----                                                                    Page 11
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

emphasized just last month, commenting on "the Code's overriding policy favoring debtor reorganization and rehabilitation."*COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.),* --- F.2d ----, 2008 WL 1885328 at * 7 (2d Cir. April 29, 2008), quoting *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., (In re Pub. Serv. Co. of N.H.),* 884 F .2d 11, 15 (1st Cir.1989). The Circuit Court held in that case that a counterpartys actions subsequent to the petition date could not terminate a debtors statutory right to assume or reject an executory contract under 365.

Moreover, bankruptcy courts also consider whether the termination could have been reversed under a state anti-forfeiture provision or other applicable state law. *City of Valdez v. Waterkist Corp. (In re Waterkist Corp.),* 775 F.3d 1089, 1091 (9th Cir.1985). It is therefore highly relevant that lease forfeitures are abhorrent under New York State law. *See Zaid Theatre Corp. v. Sona Realty Co.,* 18 A.D.3d 352, 355, 797 N.Y.S.2d 434, 436-37 (1st Dept.2005). As indicated by the history of this matter, tenants can obtain a "*Yellowstone* " injunction precluding the Landlord from enforcing its rights under many circumstances. *See, e.g., TSI West 14, Inc. v. Samson Assocs., LLC,* 8 A.D.3d 51, 52-53, 778 N.Y.S.2d 29, 31 (1st Dept.2004); *Becker Parkin Dental Supply Co., Inc. v. 450 Westside Partners, L.L.C.* 284 A.D.2d 112, 112-13, 725 N.Y.S.2d 547 (1st Dept.2001); *Long Island Gynecological Servs. v. 1103 Steward Ave. Assocs. Limited Pship,* 224 A.D.2d 591, 594, 638 N.Y.S.2d 959, 962 (2d Dept.1996); *225 E. 36th St. Garage Corp. v. 221 E. 36th Owners Corp.,* 211 A.D.2d 420, 422, 621 N.Y.S.2d 302, 304 (1st Dept.1995).

**\*10** It must be emphasized that the question here is not whether the conditional limitation in the Lease should be enforced but whether the doctrine of good faith should be applied to the facts of this case in a manner that *might* lead to forfeiture of the Lease. The same reasons that the Circuit Court canvassed in the *Queens Blvd.* case support the conclusion that, under the facts of this case, it should not be so applied. The harm to the Debtor and its creditors would be great. The Debtor would lose not only its very substantial leasehold improvements, but also the funds it has expended since the commencement of this case on installation of the tower. It should be recalled that the Debtor expended funds on the project even before the

Landlord made its motion to dismiss, some two months into the case. The Landlords delay in making this motion is not irrelevant in considering the equities.[FN19]

> FN19. Nevertheless, the Debtor cannot assert that the Court's prior order denying the Landlord's motion for relief from the stay precluded the Landlord from filing this motion. The issues on the prior motion were different and, in any event, there was no final judgment on the merits, a requirement for application of both *res judicata* and collateral estoppel. *See Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 88 (2d Cir.1997) (*res judicata*); *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir.2006) (collateral estoppel). Nor has the Debtor provided support for the principle that the Landlord waived its right to make a motion to dismiss or that the Landlord elected its remedies. A motion for relief from the stay does not ordinarily preclude the filing of the other motions in the case if stay relief is denied.

In contrast to the grave harm to the Debtor, the harm to the Landlord can be minimized and compensation can be provided. The question is not whether the cooling tower will be installed-if the Debtor remains in possession, the only question is when. If the Debtor moves to assume, the Landlord will have to be compensated not only for its legal fees in litigation with the Debtor but also for any losses it can establish for inability to sell condenser water to other tenants during the 2008 summer months.

Moreover, the actual benefit to the Landlord of an immediate dismissal is uncertain. The Court takes particular note of the Landlords plea, in its "Post-Trial Memorandum of Law on Motion to Dismiss," that the Court not merely dismiss the case but either order the immediate eviction of the Debtor or the appointment of a Chapter 11 or Chapter 7 trustee. The Landlord states,

> Landlord is concerned that dismissal of the case will result in continuing litigation in the state court, including additional attempts at injunctions, which will lead to Debtor's continued occupancy, nonpayment of rent, non-construction of the

Cooling Tower, unauthorized nightclub events, and possibly other mischief. Thus Debtor's bad faith in filing will be perpetuated during additional rounds of litigation. Debtor sought relief in this Court, and Landlord respectfully submits that this Court should grant appropriate relief to all parties in interest, including Landlord. Thus Landlord seeks alternate relief to being granted termination of the Lease and right to immediate possession. (p. 18.)

Obviously, if the Court dismisses the case on the ground that the case should never have been filed at all, it can only remit the Landlord to its State remedies, not order the Debtor's eviction under State law. It would be entirely inconsistent with an order of dismissal for the Court to preclude the Debtor from exercising any State remedies it may have to prevent forfeiture of its Lease.[FN20]

> FN20. The Bankruptcy Code provides for a debtor that is a lessee under a nonresidential real property lease to surrender possession to the Landlord if it does not timely assume or reject the lease, § 365(d)(4), but this of course assumes that there is a valid case, not a dismissal on grounds of bad faith.

On the other hand, if the case is sustained, it is the Court's obligation to minimize harm to the Landlord and all other parties in interest. There is no question that this Debtor has had to file two Chapter 11 cases in less than six years. The Debtor mismanaged the tower installation prior to the filing in this case and has shown little progress since then. After the petition was filed, it fired its general contractor, who had been approved by the Landlord, hired a less-expensive but unqualified replacement, and then had to rehire the prior contractor based on the Landlord's refusal to approve the replacement.[FN21] There is still no evidence before the Court that the Debtor has purchased the tower or that it even has a timetable for completion of installation. At the same time the late-night parties have continued without any indication that the Debtor has attempted to restrain them or the advertising that supports an after-hours nightclub operation on the premises of a restaurant that is ostensibly oriented toward children.

> FN21. The Lease provision on which the Landlord relied was explicit in giving the Landlord a right to approve or disapprove

the Debtor's general contractor in this major project in its sole discretion.

*11 Accordingly, even though it sustains the case, the Court agrees that the case cannot continue to be administered as it has been. The Court will not appoint a Chapter 11 or Chapter 7 trustee at this time. The Debtor and other parties in interest should have an opportunity to be heard on any such motion, and also on the possible appointment of an examiner. The Debtor should also have an opportunity to appoint an officer or representative, reasonably acceptable to the Landlord, to organize and supervise installation of the tower. There is no question that the Debtor's management knows how to operate a restaurant, but no evidence that the Debtor can accomplish the prompt installation of a cooling tower. The Debtor and Landlord are directed to meet and confer on the immediate retention of a qualified professional. If such a person is not retained by the Debtor within 10 days, to take charge of the tower's installation, the Landlord may file a motion on shortened notice for a Chapter 11 trustee, for conversion to Chapter 7, or for an examiner.

The parties have an action pending in State court on the issue whether the late-night parties are appropriate under the use-clause in the Lease or the Stipulation agreed to in the Debtor's prior Chapter 11 case. This Court does not intend to decide that case. However, it does have an obligation to reduce the harm to the Landlord from continuation of this Chapter 11 proceeding. The Landlord may, if it is so advised, file an immediate motion for a moratorium on the late-night parties, if the Debtor is not willing to terminate them until the State court has ruled.

As noted above, one of the investors in the Debtor has purported to escrow $600,000 with Debtor's counsel for the construction of the tower. Debtor's counsel is hereby ordered not to release or encumber the $600,000 pending further order of this Court. The Debtor is further directed to file a statement as to the total anticipated cost of the tower within ten days of appointment of a professional described above. The Debtor must promptly thereafter escrow the remainder of the funds necessary to install the tower.

### CONCLUSION

The Landlord's motion to dismiss is denied. The

--- B.R. ----
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)
**(Cite as: --- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.))**

Landlord may move for the appointment of a trustee or examiner under Chapter 11, or conversion of this case to a case under Chapter 7, if the Debtor has not within ten days appointed a qualified person to supervise all aspects of the installation of the tower. The Landlord may also move for interim relief in connection with the late-night parties if it is so advised. The $600,000 in escrow shall not be released or encumbered absent further order of this Court, and the Debtor must in due course increase the amount in escrow to cover all anticipated costs of installation of the tower.

IT IS SO ORDERED.

Bkrtcy.S.D.N.Y.,2008.
In re 1633 Broadway Mars Restaurant Corp.
--- B.R. ----, 2008 WL 2156344 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

{ 14189/011/01166884:1-NBM}© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.